PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1743
_____

CHARLES MCNAIR; THEODORE AUSTIN; DANIELLE
DEMETRIOU;
USHMA DESAI; JULIE DYNKO,

Appellants

v.

SYNAPSE GROUP INC.


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 06-cv-5072)
District Judge:  Hon. Jose L. Linares

_____

Argued
January 10, 2012

Before:  FUENTES, JORDAN, and NYGAARD, *Circuit
Judges*.

(Filed:  March 6, 2012)

_____

Paul Diamond
1605 John Street - #102
Fort Lee, NJ  07024

Gary S. Graifman   [ARGUED]
Kantrowitz, Goldhamer & Graifman
747 Chestnut Ridge Road - #200
Chestnut Ridge, NY  10977

Michael S. Green
Green & Associates
522 Route 18 - #5
P.O. Box 428
East Brunswick, NJ  08816
     *Counsel for Appellants*

Geoffrey W. Castello, III
Lauri A. Mazzuchetti
Vincent P. Rao, II
Kelley, Drye & Warren
200 Kimball Drive
Parsippany, NJ   07054

Thomas E. Gilbertsen   [ARGUED]
Veneble
575 7th Street, N.W.
Washington, DC   20004
     *Counsel for Appellee*

_____

## OPINION OF THE COURT

JORDAN, *Circuit Judge*.

A group of former customers (collectively, "Appellants" or "the named plaintiffs") of Synapse Group Inc. ("Synapse") successfully petitioned under Federal Rule of Civil Procedure 23(f)[1] for interlocutory review of an order denying class certification. More specifically, Appellants challenge the decision of the United States District Court for the District of New Jersey to deny certification of a Rule 23(b)(2) injunctive relief class consisting of Synapse customers who received automatic renewal notifications in connection with magazine subscriptions obtained through Synapse. Because we conclude that Appellants, none of whom are current Synapse customers, lack standing to seek the remedy they are pursuing on behalf of the class, we will affirm the District Court's order denying class certification.[2]

---

[1] That rule provides that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification … if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered." Fed. R. Civ. P. 23(f). We will hereafter refer to the Federal Rules of Civil Procedure simply as "Rules."

[2] Appellants have moved to file Volume IV of the appendix and their reply brief under seal because some of the materials therein were produced under a confidentiality order and filed under seal in the District Court. Appellants, however, have failed to limit the scope of their request by asking us to seal only those materials that are actually the subject of the confidentiality order, and we will therefore

3

## I. Background

### A. *Synapse's Magazine Sales*

Synapse, a wholly-owned subsidiary of Time Inc. ("Time"), is the largest marketer of magazine subscriptions in the United States. It conducts its business operations under several other names, including Magazine Direct, New Sub Magazine Services, SynapseConnect, Synapse Solutions, and CAP Systems. Aiming to "bring magazine publishers and potential subscribers together by promoting trial offers that might evolve into long-term subscriptions," Synapse markets over 800 magazines to consumers through "credit card issuers, catalogers, retailers, airlines, and internet companies." (App. at 643.)

---

deny their request, without prejudice to their submitting an appropriately limited motion. *See* L.A.R. 30.3(b) (2008) ("Records sealed in the district court … must … not be included in the paper appendix."); *see also Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1245 n.25 (10th Cir. 2009) (denying "the parties' motions to seal both the record on appeal and their briefs" because "[t]he court's business is public business"); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 785 (3d Cir. 1994) ("Disturbingly, some courts routinely sign orders which contain confidentiality clauses without considering the propriety of such orders, or the countervailing public interests which are sacrificed by the orders."). To the extent we have not already relied on the materials filed under seal in setting forth the facts of this case, we will delay the effective date of this denial for two weeks, to allow Appellants an opportunity to prepare a properly redacted filing.

The majority of Synapse's magazine subscriptions are offered under what is known as a "continuous service plan" whereby a customer's subscription does not expire unless and until the customer opts to cancel it.  To secure subscribers to those plans, Synapse offers introductory promotional offers under which customers can receive magazine subscriptions for free or at greatly reduced rates.  Although the offers are varied, all customers provide a credit or debit card number upon signing up and are informed that, once the promotional rate expires, their card will be charged at the regular subscription rate, unless the subscription is cancelled.

1. *Synapse's Advance Notification of Future Charges*

Prior to processing charges for the promised rate increase, however, Synapse provides its customers with advance notice.  That notice, made in accordance with the terms of Synapse's initial offer, explains the impending charge for continued services and provides a toll-free telephone number for the customer to call to cancel his or her magazine subscriptions.  Before 2009, Synapse provided the majority of those notifications by sending its customers a sealed double postcard with a visible exterior and a concealed interior (the "Standard Postcard").  The front of the Standard Postcard's exterior was addressed to the customer and contained no other text besides a return address.  The back of the Standard Postcard's exterior appeared as follows:

5

## Special Customer Communication


## Moving?

We guarantee a hassle-free subscription. You'll never miss an issue. No bills, reminders, publisher renewal notices and no telemarketing calls. We do the work for you by automatically extending your subscription each year for as long as you want your selections.

We guarantee to send you advance notice every year about your next continuous-service subscription period and rates. We will send a notice that spells out: your rate, your number of issues and when your credit card will be charged. If you don't wish to continue, you can simply cancel before your new term begins.

We guarantee you uninterrupted service. As a Valued Subscriber, we guarantee you outstanding customer service.

Not a problem. We'll make sure you don't miss a single issue of your favorite magazines. It's one of the benefits of being a subscriber. Just complete and return the form below:

_____
Name

_____
New Address

_____

_____
City                          State/Zip

**SEE INSIDE FOR DETAILS.**

02V11

(App. at 507.) The Standard Postcard's interior, which, again, was only visible if opened, stated the names of the magazines subscribed to, the number of issues ordered, the cost of the automatic renewal, and a toll-free number for customers to call to cancel their magazine subscriptions, if they so desired.

Synapse's market testing demonstrated that an explicit statement on the exterior of the Standard Postcard that it was an "automatic renewal notice" or an "automatic magazine renewal" would increase the number of pre-billing cancellations. For example, adding the words "Your Automatic Magazine Renewal Notice" to the front of the

6

Standard Postcard's exterior resulted in an increase of several percentage points in pre-billing cancellations. An expert retained by Appellants took that into account in opining that the Standard Postcard was "intentionally designed to avoid giving customers notice of renewal." (App. at 1098.)

Beginning in February 2009, Synapse voluntarily began using a new, non-folded, postcard to provide its advance notifications to customers (the "Single Postcard"). Unlike the Standard Postcard, the Single Postcard contains no interior. The back of the Single Postcard has a picture of magazines in a mailbox and states that magazine subscriptions are available for up to 40% off newsstand prices. The front of the Single Postcard contains two panels. On the left side, it states in large print: "The low rate for your next year of issues is guaranteed!" (App. at 1483.) And then, in smaller print, it says:

> **We guarantee a hassle-free subscription.** You'll never miss an issue. No bills, reminders, publisher renewal notices and no telemarketing calls. We do the work for you by automatically extending your subscription each year for as long as you want your selections.
>
> **Your service includes convenient home delivery and huge savings off the newsstand price.**
>
> **We guarantee to send you advance notice every year about your next subscription period and rates.** We will send you notice that spells out: your guaranteed low rate, your

number of issues and when your credit card will be charged.  If you don't wish to continue, you can simply cancel before your new term begins.

**We guarantee you outstanding savings.**  As a Valued Subscriber, enjoy substantial savings off cover price.   For more great deals, visit www.magazineoutlet.com.

(*Id.*)  On the right side, the following appears:

Thank you for being a valued customer.   We hope you have been enjoying your service, as your complete satisfaction is our ultimate goal.

For your convenience, we will continue to ensure that you don't receive extra unwanted mail – the multiple renewal notices and bills that normally come with a subscription.  For the next term of issues the credit card you previously provided for your selections and will be charged for [magazine title], at $[price] … .  If you do not wish to continue, call 800 927 9351 by [date] and no charge will appear.  As long as you are satisfied, your selections will continue through our open-ended, customer-friendly subscription method – continuous service.  Of course, we will always send you a courtesy reminder before you are ever billed to ensure your satisfaction.   Remember, you can always look for the expiration date on your magazine label.  You may cancel anytime and receive a refund of unserved issues.  If a title ceases, it will be replaced with one of equal or

8

greater value. We hope you enjoy your selections and look forward to serving you in the future. Please keep this notice for your records.

(*Id.*)

Appellants' expert reviewed Synapse's Single Postcard and concluded that it, like the Standard Postcard, is "an exercise in deception" inasmuch as it provides scant information and is designed to appear like a direct mail offer for a new subscription rather than an automatic renewal notice for an existing subscription.[3] (App. at 1495.)

---

[3] Appellants believe that Synapse's use of the Standard Postcard and Single Postcard violates accepted standards in the publishing industry, as evidenced by an agreement between Synapse's parent company, Time, and 23 states' Attorneys General. That agreement, known as the Assurance of Voluntary Compliance or Discontinuance (the "Assurance"), provides that Time and its wholly-owned subsidiaries must send continuous-service-plan customers advance notification reminders that clearly and conspicuously identify the relevant terms concerning automatic renewals. Although Appellants acknowledge that Synapse is not bound by the Assurance because it did not become a wholly-owned subsidiary of Time until after the Assurance was signed, they contend that the Assurance demonstrates that there are governing industry standards which Synapse is knowingly violating by using deceptive advance notification reminder mailings.

## 2. *Synapse's Cancellation Process*

As detailed above, while the effectiveness of the message may be open to dispute, both the Standard Postcard and the Single Postcard state that a customer will be automatically charged a renewal rate if the customer does not cancel his subscription before a certain date. If a customer's subscription is not timely cancelled, however, the customer can still seek a complete or pro rata refund. There are at least two ways to reach Synapse to request cancellation or seek reimbursement of an unwanted automatic renewal charge. The customer may either call the number listed on the advance notification mailing, or he may call a toll-free number that is automatically listed on his credit or debit card statement when a charge is submitted by Synapse.

While the toll-free number that appears on a customer's billing statement differs from the phone number that appears on Synapse's advance renewal notices, both lead customers to Synapse's Interactive Voice Recognition ("IVR") telephone system. That system is meant to be entirely automated, so that a caller will not ordinarily interact with a human being, but the IVR usually does permit customers to reach a live operator by pressing zero or failing to respond to the IVR's prompts. When a customer attempts to cancel his magazine subscriptions using the IVR system, the IVR attempts to retain that business by presenting so-called "save offers." On average, approximately 30% of callers accept a save offer. The remaining 70% of Synapse customers who call to cancel end up doing so, and most are, in fact, able to accomplish that without speaking with a live operator.

B.    *Procedural History*

Appellants, who are "residents"[4] of New Jersey, New York, or the District of Columbia, received the Standard Postcard when they were Synapse customers and brought suit against Synapse after allegedly suffering monetary injury as a result of Synapse's deceptive business practices.[5]

---

[4] In their second amended complaint, the operative pleading in this case, Appellants refer to themselves as "residents" of their respective states, not as "citizens" or "domiciliaries" of those states. (*See, e.g.*, App. at 293 ("McNair is a resident of … New Jersey … having a place of residence in … New Jersey.").) Although those averments need not, and do not, serve as a basis for our disposition, they are jurisdictionally inadequate in this diversity of citizenship case. *See Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972) ("[M]ere residency in a state is insufficient for purposes of diversity [of citizenship]."). So too is Appellants' allegation of Synapse's citizenship, which, instead of identifying Synapse's principal place of business and state of incorporation, refers only to "a" principal place of business. (App. at 294); *see* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State … by which it has been incorporated and of the State … where it has its principal place of business … ."); *J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1265 n.3 (3d Cir. 1994) (alleging that a corporation has "'a' principal place of business" in a given state is insufficient to establish domicile so as to "properly plead diversity jurisdiction"). This lack of care in invoking the District Court's jurisdiction is regrettable.

[5] Appellants do not allege that they received Synapse's

11

1.    *Appellants' Initial Motion for Class Certification*

On June 29, 2009, Appellants moved for class certification based on a prior iteration of their complaint, which pleaded consumer fraud claims for monetary and injunctive relief under New Jersey, New York, and District of Columbia law. *McNair v. Synapse Grp., Inc.*, No. 06-cv-5072, 2009 WL 1873582, at *8, *12 (D.N.J. June 29, 2009). Specifically, Appellants asked the District Court to certify the following class under Rules 23(b)(2) and (b)(3):

> From October 23, 2000 to the date of the order certifying the class, all persons residing in New Jersey, New York and the District of Columbia who accepted an initial magazine subscription, or subscriptions, offered by Synapse, were sent [the Standard Postcard] notification with the "standard exterior" in advance of an automatic charge for an additional term or renewal of their subscription(s), and either before or after being charged for the additional term or renewal of their subscription(s):
>
> (1) called the Synapse "IVR," and responded affirmatively to the recorded question asking whether they were calling to cancel a magazine or selected an option to cancel a magazine from the list of options presented, and rejected all "save attempts" that may have been offered; or,

new Single Postcard.

(2) fully cancelled the subscription(s) by speaking with a Synapse live operator; and, were not refunded all charges for the additional term or renewal of the magazine subscription(s) and/or were not reimbursed upon request to Synapse all bank overdraft charges, on their debit or credit card(s). Excluded from the class are defendant, its agents and affiliates, and any government entities.

*Id.* at *6 (quoting Appellants' Reply Mem. of Law in Support of Class Cert.).

The District Court denied the motion. Observing that Appellants' various consumer fraud claims required a causal link between the plaintiffs' alleged injuries and the defendant's alleged deception, the District Court concluded that predominance was lacking because it could not be presumed that all of the class members were deceived by Synapse's marketing techniques. *Id.* at *12. In fact, the Court noted that two of the five named plaintiffs were not deceived by the Standard Postcard, as they "read … and acted on it." *Id.* Accordingly, as the District Court held, a Rule 23(b)(3) damages class could not be certified. The District Court also rejected Appellants' request for certification as an injunctive relief class under Rule 23(b)(2), reasoning that "the predominant relief sought … [was] money damages," and "certification under Rule 23(b)(2) [was therefore] not appropriate." *Id.* at *7. The Court stated, however, that "[a] differently defined class or one that does not predominantly seek money damages may pass muster." *Id.* at *14.

13

## 2. *Appellants' Motion to File an Amended Complaint*

Appellants did not challenge the District Court's decision denying their initial motion for class certification. Instead, on August 10, 2009, they filed a motion proposing a revised complaint that sought injunctive relief only. *See McNair v. Synapse Grp., Inc.*, No. 06-cv-5072, 2009 WL 3754183, at *1 (D.N.J. Nov. 5, 2009). Synapse opposed the new complaint on several grounds, arguing that, under Article III of the United States Constitution, Appellants lacked standing because they were no longer Synapse customers and therefore could not claim a likelihood of future injury. *See id.* at *3 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)). Synapse also argued that Appellants lacked statutory standing under New Jersey law because their amended complaint abandoned all claims for monetary relief.[6] *See id.* at *4-5 (citing *Weinberg v. Sprint Corp.*, 801 A.2d 281, 291 (N.J. 2002), for the proposition that Appellants lacked statutory standing because Appellants failed to plead "any claim for ascertainable, money, loss").

Appellants responded that they have Article III standing to seek injunctive relief because they are likely to be

---

[6] Synapse did not lodge a similar argument with respect to Appellants' claims under New York and District of Columbia law. They did, however, argue that Appellants' requested amendment would, as a whole, be futile because the proposed class failed to meet the standards necessary for certification. The District Court rejected that contention, reasoning that "any ruling on whether class certification is warranted is premature." *Synapse*, 2009 WL 3754183, at *5.

14

Synapse customers in the future. The District Court agreed with that theory. Although it acknowledged that none of the named plaintiffs claimed to be current Synapse customers, the Court decided that they had made a "sufficient showing that they are likely to become Synapse customers in the future" because Synapse is the leading marketer of magazine subscriptions and offers compelling magazine deals in which it does not clearly identify itself as the distributor. *Id.* at *4. The District Court further concluded that the named plaintiffs were likely to suffer from the alleged deception again because "the whole point of" the advance notification renewal postcards is to fool consumers into discarding it. *Id.* However, because Appellants' complaint had abandoned claims for monetary relief, the District Court agreed with Synapse that Appellants lacked statutory standing to seek injunctive relief under New Jersey law. *Id.* at *5.

### 3. *Appellants' Second Amended Complaint and Motion for Class Certification*

Appellants filed a timely motion for reconsideration on November 17, 2009, apprising the Court that they had, in fact, intended to seek monetary relief in their amended complaint – albeit only on behalf of themselves individually – and that they therefore had statutory standing to seek injunctive relief under New Jersey law. The District Court, over Synapse's objection, entered an order permitting Appellants to again amend their complaint for the purpose of clarifying their assertion of individual claims for monetary relief. Appellants did so on December 31, 2009, filing a second amended complaint (the "Complaint"),[7] which is the operative pleading

---

[7] Appellants second amended complaint is actually the

before us on this appeal and which asserts three separate consumer fraud claims under New Jersey, New York, and District of Columbia law. It seeks both monetary and injunctive relief for the individual Appellants but only injunctive relief for class members.

On June 18, 2010, Appellants moved for class certification under Rule 23(b)(2), asking the District Court to certify the following class:

> All persons residing in New Jersey from October 23, 2000 to the date of the order certifying the class, and all persons residing in New York and the District of Columbia from

---

fifth iteration of Appellants' pleading filed on the District Court's docket over the course of this litigation. The first complaint, filed on October 23, 2006, named only Charles McNair as a plaintiff. The second, filed on August 2, 2007, added Theodore Austin, Danielle Demetriou, Steven Novak, Rod Bare, Ushma Desai, and Julie Dynko as named plaintiffs. The third, submitted for the District Court's review by way of Appellants' August 10, 2009 motion to file an amended complaint, dropped Bare and Novak as plaintiffs. The fourth, submitted by way of Appellants' November 17, 2009 motion for reconsideration, added requests for monetary relief on behalf of the named plaintiffs remaining in Appellants' third complaint. The fifth and final complaint was filed on December 31, 2009, after the District Court granted Appellants' November 17 motion to reconsider and afforded them an opportunity to prepare another version of the complaint.

16

October 23, 2003 to the date of the order certifying the class, who as customers of Synapse were mailed a postcard advance notification of an automatic charge for an additional term or renewal of their magazine subscription(s) that failed to state that he or she is an Automatic Renewal Customer or is subject to an automatic charge, in type larger and more prominent than the predominant type in the notice. Excluded from the class are defendant, its agents and affiliates, and any government entities.

(App. at 485.)    Appellants also sought to certify two subclasses:

All members of the Class who were sent Defendant's [Standard Postcard] as the advance notification of an automatic charge for an additional term or renewal of their subscription(s).

… .

Members of the Class for whom the postcard and/or billing descriptor on their credit card or bank statement provided a telephone number to an IVR that did not audibly state how to transfer to a live operator.

(*Id.*)

The District Court denied Appellants' motion on November 15, 2010, holding that the putative class lacked the

17

requisite cohesion for purposes of Rule 23(b)(2). *See McNair v. Synapse Grp., Inc.*, No. 06-cv-5072, 2010 WL 4777483, at *7-8 (D.N.J. Nov. 15, 2010). According to the Court, certification was inappropriate because the injunctive relief sought would not "benefit the entire class" since Synapse's conduct did not affect all class members in a similar way. *Id.* at *7; *see id.* at *6 ("Plaintiff McNair testified that he read the card and understood it … . For class members like Mr. McNair, the relief requested would have no benefit.").

Appellants were granted interlocutory appellate review pursuant to Rule 23(f), and this appeal followed.[8]

---

[8] Before seeking interlocutory appellate review, Appellants asked the District Court to reconsider its order denying class certification. The District Court denied that motion. *McNair v. Synapse Grp., Inc.*, No. 06-cv-5072, 2011 WL 666036 (D.N.J. Feb. 14, 2011). Appellants thereafter filed their Rule 23(f) petition, which was timely as measured from the order denying reconsideration, but untimely as measured from the order denying class certification. We granted Appellants' petition, concluding – as our sister circuits have – that the period for filing a Rule 23(f) petition "does not start to run until the district judge rules on [a timely] motion for reconsideration" of a class certification order. *Shin v. Cobb Cnty. Bd. of Educ.*, 248 F.3d 1061, 1064-65 (11th Cir. 2001); *see Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 837 (7th Cir. 1999) (holding that, although Federal Rule of Appellate Procedure 4(a)(4) does not toll the time to appeal an interlocutory order, a timely-filed motion for reconsideration of a class certification order nevertheless "defers the time for appeal until after the district judge has disposed of the motion").

## II.   Discussion[9]

As it did before the District Court, Synapse argues that Appellants lack Article III standing to pursue injunctive relief.  If Synapse is correct, Appellants are not entitled to represent the putative Rule 23(b)(2) class they asked the District Court to certify.  *See, e.g.*, *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims

---

[9] The District Court had jurisdiction, if at all, pursuant to 28 U.S.C. § 1332(d)(2)(A), which permits district courts to exercise "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which … any member of a class of plaintiffs is a citizen of a State different from any defendant."  We have appellate jurisdiction under 28 U.S.C. § 1292(e) and Rule 23(f), and review the District Court's order denying certification for an abuse of discretion.  *Behrend v. Comcast Corp.*, 655 F.3d 182, 189 (3d Cir. 2011).  Our review is plenary, however, to the extent a threshold question of law, such as Article III standing, bears on our review of that order.  *See Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 86 (3d Cir. 1999) ("We exercise plenary review of standing … .); *see also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) (reviewing a certification order under Rule 23(f), and observing that the standing inquiry "is a question of law that [is] review[ed] *de novo*").

19

of the class."). We thus consider whether Appellants have standing to seek injunctive relief for the class.[10]

In order to have Article III standing to sue, a plaintiff bears the burden of establishing "(1) [an] injury-in-fact … that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) [a likelihood] … that the injury will be redressed by a favorable decision." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005); *see N.J.*

---

[10] Although the scope of our Rule 23(f) appellate review is limited, *see McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, 295 F.3d 380, 390 (3d Cir. 2002) (observing that "Rule 23(f) inquiries" are limited "to class certification issues"), we join our sister circuits in considering Article III standing as a necessary threshold issue to our review of an order denying class certification. *See Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 420 (D.C. Cir. 2006) (stating that constitutional standing may be considered in an appeal under Rule 23(f)); *Olden v. LaFarge Corp.*, 383 F.3d 495, 498 (6th Cir. 2004) ("The question of subject matter jurisdiction is a prerequisite to class certification and is therefore properly raised in this Rule 23(f) appeal."); *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002) ("[A] determination on standing is a part of the class certification analysis, and thus, subject to review under Rule 23(f)." (citation and internal quotation marks omitted)); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry; thus, despite the limited nature of a Rule 23(f) appeal, defendants can raise the issue of standing … .").

20

*Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011) (affirming dismissal for lack of standing because the plaintiffs failed to meet "their burden in pleading facts that establish the requisite injury in fact and therefore fail[ed] to demonstrate standing"). When, as in this case, prospective relief is sought, the plaintiff must show that he is "likely to suffer future injury" from the defendant's conduct. *Lyons*, 461 U.S. at 105. In the class action context, that requirement must be satisfied by at least one named plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011) ("Standing exists if at least one named plaintiff meets the requirements."). The threat of injury must be "sufficiently real and immediate," *Roe v. Operation Rescue*, 919 F.2d 857, 864 (3d Cir. 1990) (citation and internal quotation marks omitted), and, as a result of the immediacy requirement, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects," *O'Shea*, 414 U.S. at 495-96; *see Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("To seek injunctive relief, a plaintiff must show that he is *under threat of suffering* 'injury in fact' … ." (emphasis added)); *Lyons*, 461 U.S. at 105 ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury … .").

Pointing to the fact that Appellants are no longer customers, Synapse argues that they have no cognizable interest in the prospective relief sought in the Complaint. Appellants, in response, press the same arguments for standing that they made to the District Court, namely, that they are subject to a sufficiently real and immediate threat of future harm because Synapse is the leading marketer of magazine subscriptions and bombards the public with its offers; because it offers compelling deals in which it does not clearly identify itself; and because it sends customers advance notifications that are, by design, meant to fool consumers into discarding the notification received. Appellants further respond that they have accepted magazine offers from Synapse on more than one occasion. The District Court accepted those arguments and also seemed to agree with Appellants that the "capable of repetition yet evading review" doctrine applies,[11] because holding otherwise would unfairly "require [Appellants] to allow themselves to be continually billed for unwanted renewals either before or during the course of the litigation merely for standing purposes."

---

[11] Although federal courts generally "lack jurisdiction when 'the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,'" *Merle v. United States*, 351 F.3d 92, 94 (3d Cir. 2003) (citation and internal quotation marks omitted), the "capable of repetition yet evading review" doctrine permits consideration of a case that "would otherwise be deemed moot" when "'(1) the challenged action is, in its duration, too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again,'" *id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).

22

*Synapse*, 2009 WL 3754183, at \*4 (internal quotation marks omitted). We disagree, and conclude that Appellants have not met their burden of establishing that they have standing to seek injunctive relief.

Appellants have effectively acknowledged that they, unlike the class members they seek to represent, are not Synapse customers and are thus not currently subject to Synapse's allegedly deceptive techniques for obtaining subscription renewals.[12] (*See* App. at 316 (alleging in the Complaint that "[e]ach of the named [p]laintiffs has standing to seek injunctive relief since they are likely to become magazine customers of Defendant in the future").) Unless

---

[12] Although the Complaint does not expressly state that Appellants are former Synapse customers, it – like Appellants' briefing and representations at oral argument – implies as much. So does the appellate record. Indeed, with the exception of one of the named plaintiffs, Dynko, who was seemingly still a Synapse customer as of July 2008, the record reflects that none of the other named plaintiffs in this case were Synapse customers by that point. (*See* App. at 964 (Austin); 977 (Demetriou); 986 (Desai); 1005 (McNair).) Because the Complaint and Appellants' ensuing class certification motion were filed over a year later, and in light of the Complaint's failure to aver that Dynko received the Single Postcard that Synapse began using in 2009, *see supra* note 5, the only conclusion we can logically reach is that the one named class member who (perhaps) was a Synapse customer in July 2008 terminated her Synapse service by the time the Complaint was filed in December 2009. That, of course, occurred well before Appellants' June 2010 motion for class certification.

they decide to subscribe again, then, there is no reasonable likelihood that they will be injured by those techniques in the future. They do not allege that they intend to subscribe again. Instead, they say that they may, one day, become Synapse customers once more because "Synapse's offers are compelling propositions as evidenced by [Appellants'] own acceptance of these offers (even on more than one occasion) … ." (App. at 317.)

Perhaps they may accept a Synapse offer in the future, but, speaking generally, the law accords people the dignity of assuming that they act rationally, in light of the information they possess. *Cf. Atl. Gypsum Co., Inc. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (rejecting the plaintiffs' contention that "defendants advanced money to [a] venture with the intention of driving it into the ground so that they could control the failed venture and then wait in line with other creditors in a bankruptcy proceeding" because that "view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent"); John N. Drobak, *Cognitive Science*, *in The Elgar Companion to Law and Economics* 453, 453 (Jürgen G. Backhaus ed., 2d ed. 2005) ("Much of legal theory, like economics, assumes that people act rationally or at least can be induced to act rationally by the correct rules."). Whether they accept an offer or not will be their choice, and what that choice may be is a matter of pure speculation at this point.[13] Indeed, while

---

[13] If Appellants' suggestion is that they may not be able to help themselves when confronted with a really good subscription offer, they have still not provided a basis for standing. Pleading a lack of self- restraint may elicit

24

the injuries Appellants allegedly suffered when they were Synapse customers may suffice to confer individual standing for monetary relief,[14] the wholly conjectural future injury Appellants rely on does not, and cannot, satisfy the constitutional requirement that a plaintiff seeking injunctive relief must demonstrate a likelihood of future harm.[15] *See Lyons*, 461 U.S. at 109 (observing that the plaintiff "ha[d] a

---

sympathy but it will not typically invoke the jurisdiction of a federal court.

[14] At least constitutional standing; we say nothing of statutory requirements that may or may not be met.

[15] Appellants also suggest, albeit obliquely, that they might be tricked into becoming Synapse customers again because Synapse does not prominently identify itself when making its magazine offers. (*See* App. at 317 ("Synapse, if it identifies itself at all in these offers, does so in the fine-print.").) However, Appellants are under no compulsion to uncritically accept magazine subscription offers. Because Appellants are familiar with Synapse's practices as well as the various names under which it operates, it is a speculative stretch to say they will unwittingly accept a Synapse offer in the future. But even if they did, they would only be harmed if they were again misled by Synapse's subscription renewal techniques, which would require them to ignore their past dealings with Synapse. In short, Appellants ask us to presume they will be fooled again and again. While we cannot definitively say they won't get fooled again, it can hardly be said that Appellants face a likelihood of future injury when they *might* be fooled into inadvertently accepting a magazine subscription with Synapse and *might* be fooled by its renewal tactics once they accept that offer.

25

claim for damages … that appear[ed] to meet all Article III requirements" but that he nevertheless could not "meet[] the preconditions for asserting an injunctive claim in a federal forum"); *Tucker v. Phyfer*, 819 F.2d 1030, 1034-35 (11th Cir. 1987) (noting, in rejecting class certification under Rule 23(b)(2), that "a plaintiff who has standing to bring a damages claim does not automatically have standing to litigate a claim for injunctive relief arising out of the same set of operative facts" and that the plaintiff's proposed injunctive relief class was inappropriate notwithstanding his "live claim for money damages").

Because Appellants have not established any reasonable likelihood of future injury in this case, they have no basis for seeking injunctive relief against Synapse. *See Arguello v. Conoco, Inc.*, 330 F.3d 355, 361 (5th Cir. 2003) (customers who were subject to past discrimination by a gas station attendant lacked Article III standing to sue for prospective relief); *Frankle v. Best Buy Stores, L.P.*, 609 F. Supp. 2d 841, 848 (D. Minn. 2009) (explaining that a former customer had no "standing to seek an injunction … because she [was] no more likely than anyone else to be impacted"); *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1348 (N.D. Ga. 2009) (former customer of the defendant's who did not allege "that he plans in the future to purchase a Dryer from Defendant or that he plans in the future to have a Dryer installed by Defendant" lacked standing to pursue injunctive relief on behalf of a class of consumers who might be subjected to the allegedly illegal practice); *Smith v. Chrysler Fin. Co., L.L.C.*, No. 00-cv-6003, 2004 WL 3201002, at *4 (D.N.J. Dec. 30, 2004) ("The injury which Plaintiffs allege, that they may want to buy another Chrysler

in the future and may be discriminated against by Defendant, is simply too speculative … .").

Nor is Appellants' position strengthened by the "capable of repetition yet evading review" doctrine. They argue that they "should not be required to allow themselves to be continually billed … merely for standing purposes" since "the term of a subscription purveyed by Synapse is shorter than the course of a typical litigation." (App. at 317.) But the inescapable fact is – as Appellants' speculation about their future actions reflects – they cannot "make a reasonable showing that [they] will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109. That means they cannot successfully invoke the "capable of repetition yet evading review" doctrine. *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (stating the "capable of repetition yet evading review" doctrine applies in exceptional situations only and requires "a reasonable expectation that the same complaining party [will] be subject to the same action again" (alteration in original) (internal quotation marks omitted) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990))); *Abdul-Akbar v. Watson*, 4 F.3d 195, 207 (3d Cir. 1993) ("[C]onjecture as to the likelihood of repetition has no place in the application of this exceptional and narrow grant of judicial power.").

Appellants' contention, moreover, is based on a false premise – namely, the alleged inequity in requiring them to maintain Synapse subscriptions throughout the duration of the class action litigation "merely for standing purposes." (App. at 317.) In reality, standing is determined at the outset of the litigation, *Davis v. FEC*, 554 U.S. 724, 734 (2008), and Appellants would have been able to represent an injunctive relief class if they had maintained their subscriptions until

27

after moving for class certification,[16] *see Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000) ("So long as a class representative has a live claim at the time he moves for class certification, neither a pending motion nor a certified class action need be dismissed if his individual claim subsequently becomes moot.").[17]  In

---

[16] Moreover, it is not the case that the named plaintiffs' standing to seek injunctive relief rises or falls solely with their status as Synapse customers.  Appellants only needed to demonstrate that  they were "likely to suffer future injury" from the Synapse's conduct.  *Lyons*, 461 U.S. at 105.  The best way to do that, of course, would have been to show they were Synapse customers, but that is not necessarily the only way.  The problem here is that Appellants provided no basis for their assertion of future harm.

[17]  Although Appellants' Complaint implies that Appellants were no longer Synapse customers by December 2009, Appellants have not pleaded specific information concerning when they actually terminated their subscriptions with Synapse.  S*ee supra* note 12 and accompanying text.  Nor have they made any effort to establish that they faced a likelihood of future injury by Synapse at the time when their various complaints were filed.  Accordingly, we have treated the justiciability question presented as one of standing, although we recognize that Appellants' Article III problem might sound in mootness if Appellants initially had standing to seek injunctive relief but lost it before moving for class certification.  *See Davis*, 554 U.S. at 734 (stating that "the standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed"); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 69 (2d Cir. 2001) ("[I]f the plaintiff loses standing …

addition, notwithstanding that they may prefer injunctive relief as opposed to monetary relief now that a possible injunction is their only route to class certification, the notion that Appellants might have needed to maintain their subscriptions to pursue their claims (as opposed to a specific kind of relief) is misplaced, given that no one is contesting their effort to pursue their individual claims for damages. *See Lyons*, 461 U.S. at 109 ("Lyons' claim that he was illegally strangled remains to be litigated in his suit for damages; in no sense does that claim 'evade' review.").

during the pendency of the proceedings …, the matter becomes moot, and the court loses jurisdiction."). However, because it is evident that none of the named plaintiffs were Synapse customers when the Complaint was filed and they did not seek or obtain class certification until after that, *see supra* note 12, the difference between "standing" and "mootness" is essentially a semantic one in this case, *see Holmes*, 213 F.3d at 135 ("So long as a class representative has a live claim at the time he moves for class certification, neither a pending motion nor a certified class action need be dismissed if his individual claim subsequently becomes moot."). Indeed, Appellants either lack standing because they were not Synapse customers at the time they filed the relevant complaint, or lost their standing for prospective relief when they ceased being Synapse customers before seeking class certification, which results in their "claims becom[ing] moot." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir. 2002); *see Holmes*, 213 F.3d at 135-36 ("If … the putative class representative's individual claim becomes moot before he moves for class certification, then any subsequent motion must be denied and the entire action dismissed.").

Because Appellants lack Article III standing to seek injunctive relief, the District Court was obliged to deny class certification under Rule 23(b)(2).

## III. Conclusion

For the foregoing reasons, we will affirm the District Court's order denying class certification.[18]

---

[18] Synapse argued before us that the District Court lacked statutory subject matter jurisdiction under § 1332(d) because Appellants' averment that the value of the injunctive relief sought exceeded $5,000,000 is wholly speculative. In light of our conclusion that Appellants lack Article III standing to seek injunctive relief, we decline to address that argument. *See generally Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 436 (2007) (recognizing that courts may "choose among threshold grounds for denying audience to a case on the merits" (citation and internal quotation marks omitted)). Nor do we address, given the limited nature of our review, how the District Court should proceed on remand. *See Prado-Steiman*, 221 F.3d at 1277-78 (observing that, outside the "Rule 23(f) context, issues of standing are normally not available for review on interlocutory appeal").