PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3077
_____

DARYOUSH TAHA,
Individually and on Behalf of All Others Similarly Situated

v.

COUNTY OF BUCKS; BUCKS COUNTY
CORRECTIONAL FACILITY; CITIZEN INFORMATION
ASSOCIATES LLC, d/b/a Mugshotonline.com,
d/b/a bustedmugshots.com; UNPUBLISH LLC,
d/b/a Mugshots.com

COUNTY OF BUCKS; BUCKS COUNTY
CORRECTIONAL FACILITY,
                                        *Appellants*
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-12-cv-06867)
Honorable Wendy Beetlestone, District Judge
_____

Argued March 15, 2017

BEFORE: GREENAWAY, JR., SHWARTZ, and
GREENBERG, <u>Circuit</u> <u>Judges</u>

(Filed: July 6, 2017)
_____

Frank A. Chernak
Burt M. Rublin        [Argued]
Ballard Spahr
1735 Market Street, 51st Floor
Philadelphia, PA 19103
        *Attorneys for Appellants*

Alan E. Denenberg
Abramson & Denenberg
1315 Walnut Street, 12th Floor
Philadelphia, PA 19107

Robert J. LaRocca    [Argued]
Jonathan Shub
Kohn Swift & Graf
One South Broad Street, Suite 2100
Philadelphia, PA 19107
        *Attorneys for Appellee*

Crystal H. Clark
McNees Wallace & Nurick
570 Lausch Lane, Suite 200
Lancaster, PA 17601
        *Attorneys for Amicus Curiae County*
        *Commissioners Association of Pennsylvania*

Janet F. Ginzberg
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19102
    *Attorney for Amicus Curiae*
    *Community Legal Services*

_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I. INTRODUCTION

Defendant-appellants Bucks County, Pennsylvania, and the Bucks County Correctional Facility bring this interlocutory appeal of the District Court's May 4, 2016 order certifying a class to pursue claims against them brought by plaintiff-appellee Daryoush Taha, the class representative. In 2011, defendants created a publicly searchable "Inmate Lookup Tool" into which they uploaded information about tens of thousands of people who had been held or incarcerated at the Bucks County Correctional Facility since 1938. Taha subsequently filed suit against the defendants who are appellants on this appeal, and to whom we are referring when we use the term "defendants," and certain other defendants that we need not identify alleging that they had publicly disseminated information on the internet in violation of the Pennsylvania Criminal History Record Information Act ("CHRIA"), 18 Pa. Cons. Stat. § 9102 <u>et</u> <u>seq.</u>, about his expunged 1998 arrest and incarceration in Bucks

County. The Court granted Taha's motion for partial summary judgment on liability on March 28, 2016, before certifying a plaintiffs' punitive damages class of individuals about whom information of their incarceration had been disseminated online. At that time the Court found that the only remaining question of fact was whether defendants had acted willfully in disseminating the information. After the Court certified the class by order of May 4, 2016, we granted defendants permission on July 5, 2016, to bring this interlocutory appeal pursuant to Fed. R. Civ. P. 23(f).

Defendants claim that the District Court erred in granting Taha partial summary judgment on liability before ruling on his motion seeking class certification. They also assert that the Court erred on a number of grounds in certifying a punitive damages class. In this regard, defendants challenge Taha's standing, the Court's holding that punitive damages can be imposed in a case in which the plaintiff does not recover compensatory damages, the Court's holding that punitive damages can be imposed on government agencies, and the Court's finding that the predominance requirement under Federal Rule of Civil Procedure 23(b)(3) had been met so that a class could be certified. For the reasons that follow, we will affirm the Court's May 4, 2016 order granting class action certification.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual History

On September 29, 1998, the police in Bensalem Township in Bucks County arrested Taha and charged him with harassment, disorderly conduct, and resisting arrest. J.A. at

972a.  After his arrest, the police transported him to the Bucks County Correctional Facility, where his booking photo was taken, and where he was held for several hours before his release.  Id. at 823a-25a.

In the ensuing criminal proceedings, all counts except for one were dismissed.  Though Taha maintained his innocence on the remaining count he agreed to participate in an Alternative Rehabilitative Disposition program for its resolution.  See id. at 963a.  When Taha completed the program a year later, the Court of Common Pleas of Bucks County issued an order directing the expungement of Taha's "arrest record and other criminal records."  Id. at 964a-65a.  In May and June 2000, the Bensalem Township Police Department, the Pennsylvania State Police Central Repository, and the Federal Bureau of Investigation all confirmed that Taha's record had been expunged.  Id. at 970a-74a.

Over a decade later in January 2011, defendants created a public "Inmate Lookup Tool" on the internet using information from their Offender Management System.  Id. at 578a-79a.  This database contained information on both current and former inmates at the Bucks County Correctional Facility.  Id. at 1386a. Information was published online between January 2011 and June 2013 about individuals who had been held or incarcerated at the Bucks County Correctional Facility from 1938 onward, a total of 66,799 people.[1]  Id. at 422a, 1381a-86a.

---

[1]    Defendants ceased uploading arrest and incarceration information in this format in June 2013 and changed their inmate lookup tool in August 2013 to include only an inmate's name, date of birth, and correctional facility ID number.  J.A. at

5

The information on Taha uploaded onto this publicly available online search tool included his color booking photograph from the shoulders up, sex, date of birth, height, weight, race, hair color, eye color, citizenship, date of his commission to the facility, date of his release from the facility, case number for the offense charged, and "DC, HARASS" as the charge information. Id. at 949a-50a. The uploaded information listed his "current location" as the "MAIN" facility in "BUCKS COUNTY." Id. at 949a. There were also several unfilled fields, including those for marital status, FBI number, state ID, alias information, detainer information, and the grade, date, and degree of offense. Id. at 949a-50a. The above uploading did not complete the dissemination of information about Taha as a number of private companies that crawl the internet to collect photographs and data found Taha's photograph and other information about him and republished it on their websites.[2] Id. at 1078a-79a, 1081a-83a, 1785a.

Taha discovered in the fall of 2011 that information about his several hours of incarceration at the Bucks County Correctional Facility in 1998 was publicly accessible on the internet despite the expungement of his record. Id. at 731a-33a. Taha and his wife claim that they both expressed sadness, frustration, outrage, and embarrassment over the availability of the expunged arrest information online. Id. at 727a-31a. Taha

1386a-88a.

[2] Taha included some of these companies as defendants but the only defendants with whom we are concerned are Bucks County and the Bucks County Correctional Facility. The companies use photographs and data about arrest records to collect revenue or charge fees for the removal of the data. See J.A. at 1655a-68a.

testified at a deposition that his mother stated that his arrest and incarceration were "shameful" and that he had "tarnish[ed] the family name." Id. at 747a. He also testified to losing weight and having difficulty sleeping after he discovered the information on the internet. Id. at 794a-96a. He was concerned that his previous employers or prospective future employers might see this information. Id. at 799a-800a. But Taha does not claim that he suffered any pecuniary loss as a result of the publication of his booking photograph and the other information.

B. Procedural History

Taha filed his suit on December 12, 2012, under section 9121 of CHRIA seeking injunctive relief and actual and punitive damages under CHRIA section 9183 against defendants based on the internet release of his "criminal history record information" stemming from his expunged 1998 arrest. After several years of litigation, the parties filed cross-motions for summary judgment. On March 28, 2016, the District Court denied defendants' motion for summary judgment and granted Taha's motion for partial summary judgment on liability under CHRIA. Defendants subsequently moved to certify the order entered on the motions for summary judgment for interlocutory appeal but the Court denied that motion and granted a motion that Taha filed for class certification on his punitive damages claim on May 4, 2016. The Court certified a class composed of "[a]ll persons whose criminal history record information was made available on the BCCF Inmate Lookup Tool." Id. at 12a.

## III. STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over Taha's action pursuant to 28 U.S.C. § 1332. On July 5, 2016, pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f), we granted defendants' motion to allow an interlocutory appeal of the class certification order. Thus, we have jurisdiction to consider defendants' appeal.

"We review a class certification order for abuse of discretion, which occurs if the district court's decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'" In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 312 (3d Cir. 2008) (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 165 (3d Cir. 2001)).

## IV. DISCUSSION

Defendants challenge the District Court's class certification order on both procedural and substantive grounds. First, they maintain that the Court erred by granting Taha's motion for partial summary judgment on liability prior to deciding Taha's motion seeking class certification. Second, they challenge the certification decision. Taha responds that defendants waived their argument about the order of the Court's decisions and that defendants' substantive contentions are incorrect. Taha also argues that the Court did not abuse its discretion in certifying a class for the purpose of determining whether defendants acted "willfully" in violating CHRIA to the end that defendants could be subject to punitive damages.

8

A.  One-Way Intervention

Defendants first claim that the District Court procedurally erred when it granted Taha's motion for partial summary judgment before it ruled on Taha's motion for class certification. Defendants argue that the Court's order of decision-making violated the rule against one-way intervention dealing with the availability of class certification under Federal Rule of Civil Procedure 23 after the merits of a case have been decided. The Supreme Court has outlined the history and reasoning behind the rule against one-way intervention:

> Rule 23 as it stood prior to its extensive amendment in 1966 . . . contained no mechanism for determining at any point in advance of final judgment which of those potential members of the class claimed in the complaint were actual members and would be bound by the judgment. Rather, '[w]hen a suit was brought by or against such a class, it was merely an invitation to joinder — an invitation to become a fellow traveler in the litigation, which might or might not be accepted.' A recurrent source of abuse under the former Rule lay in the potential that members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests. If the evidence at the trial made their prospective position as actual class members appear weak, or if a judgment precluded the possibility of a favorable determination, such putative members of the class who chose not to intervene or join as

parties would not be bound by the judgment. This situation — the potential for so-called 'one-way intervention' — aroused considerable criticism upon the ground that it was unfair to allow members of a class to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one. The 1966 amendments were designed, in part, specifically to mend this perceived defect in the former Rule and to assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments.

Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 545-47, 94 S.Ct. 756, 762-63 (1974) (footnotes and citations omitted).

The 1966 amendments changed Rule 23 to state that a decision on class certification was to be made "as soon as practicable after commencement of an action." Fed. R. Civ. P. 23(c)(1) (1966). But in 2003, Rule 23 was again amended to state that any class certification decision should be made "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). This is the standard today.

Taha argues that defendants never raised the rule against one-way intervention in the District Court or challenged the order of the District Court's decision-making process. Appellee's br. at 29-30. Thus, Taha argues, defendants have waived their one-way intervention argument. Id. He claims that defendants "actively participated in the process by which cross motions for summary judgment were submitted to the District Court for adjudication, without any objection." Id. at 30.

Defendants point to citations in the record that they contend indicate that they raised the issues that they now raise on appeal in the District Court but the references do not make any mention of the rule against one-way intervention, let alone include any objection to the Court's decision-making order. Defendants claim that they could not have "reasonably expected" that the Court would have ruled on the parties' cross-motions for summary judgment before it decided whether to grant class certification and they therefore should not be faulted for not raising the one-way intervention issue in that Court. Appellants' reply br. at 4.

"[A]bsent exceptional circumstances, issues not raised before the district court are waived on appeal." Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 253 (3d Cir. 2007). Yet we agree with defendants that they could not have been "prescient," as they put it, and predicted that the District Court would have ruled on the parties' cross-motions for summary judgment prior to deciding whether to grant class action certification. See Appellants' reply br. at 7. However, defendants submitted two post-decision motions to that Court. First, after the Court ruled on the parties' cross-motions for summary judgment on March 28, 2016, defendants filed a motion for reconsideration on April 11, 2016, in which they did not mention the one-way intervention issue or the Court's decision-making order, even though the class certification motion still was pending. The Court then held a hearing on the class certification motion on April 15, 2016, during which, so far as we can ascertain, defendants did not object to the order of the proceedings. Second, after the Court ruled on the class certification issue on May 4, 2016, defendants filed a motion to certify the summary judgment order for interlocutory appeal

11

without suggesting that they had objected to the District Court's order when making its decisions. Overall, it is clear that defendants had multiple opportunities to raise the one-way intervention issue in the District Court but failed to do so.

Defendants argue that because we have discretion to address issues even if not raised in a district court, we should consider the one-way intervention question. They rely on two cases to support their position but both are distinguishable from this case. Appellants' reply br. at 8. First, in <u>Bagot v. Ashcroft</u>, we entertained a plaintiff's argument that he had not raised in the district court but did so because it was "a pure question of law, and one that [was] closely related to arguments that [the plaintiff] did raise in that court." 398 F.3d 252, 256 (3d Cir. 2005). In <u>Bagot</u> the stakes were very high, as the failure to address the argument "would result in the substantial injustice of deporting an American citizen." <u>Id.</u> Then in <u>Huber v. Taylor</u>, we found that a choice of law issue had not been waived when the district court had overlooked the issue even though it was "inherent in the parties' positions throughout th[e] case," which the district court could see from the parties' consistent citations to different state laws in their briefs. 469 F.3d 67, 75 (3d Cir. 2006).

In contrast to the parties in <u>Bagot</u> and <u>Huber</u>, defendants in this case appear not to have made even a passing or indirect mention of the one-way intervention issue in the District Court either before or after the Court made its decisions on summary judgment and class certification. Furthermore, the one-way intervention issue is unrelated to the other arguments that defendants advanced in that Court. It is clear that they had numerous opportunities to inform that Court that they took issue with the order in which the Court was making its decisions but

12

they never did so. Thus, this case is not a rare case in which we will exercise our discretion to entertain an issue initially raised on appeal.

B. Class Certification Decision

Next, defendants argue that the District Court abused its discretion in certifying a class solely for the purpose of determining whether punitive damages should be imposed against them. They claim that Taha does not have Article III standing or "aggrieved" party standing as CHRIA requires. They maintain that the District Court erred in certifying the punitive damages class where the class representing Taha had not suffered compensatory damages. They contend that CHRIA does not permit the imposition of punitive damages on government agencies because CHRIA does not contain a targeted waiver of sovereign immunity. Finally, they argue that the Court erred in finding that the Rule 23(b)(3) predominance factor was met because, in their view, the determination of the amount of punitive damages depends on the impact on class members by the disclosure of their CHRIA-protected information. Taha contests all of these points and maintains that the Court properly certified the punitive damages class.[3]

---

[3] Taha also contends that defendants waived their Rule 23 arguments, other than the argument addressing the predominance factor, because they did not raise these arguments when opposing the motion for class certification. However, unlike defendants' one-way intervention argument, which defendants did not raise even in passing at any point before the District Court, defendants did raise all of their other arguments at various times before that Court and we thus will consider

13

For the reasons that follow, we determine that Taha has both Article III and statutory "aggrieved" party standing. We conclude that the District Court did not err in holding that, under CHRIA, in certain circumstances punitive damages may be imposed against a defendant even though the plaintiff does not recover compensatory damages from that defendant. Furthermore, CHRIA on its face permits punitive damages to be imposed on government agencies. Finally, we hold that the Court properly determined that common questions predominate over individual questions in the case so that the predominance aspect of Rule 23 has been met. Accordingly, we will affirm the District Court's class certification order of May 4, 2016, in all respects.

## 1. Article III Standing

Defendants maintain that Taha lacks Article III standing because the District Court found that he had not suffered compensatory damages attributable to the dissemination of the expunged information in violation of CHRIA.[4] Specifically, they contest Taha's ability to show that he suffered an "injury in fact" as required to establish standing. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992) (stating that "the irreducible constitutional minimum of standing

them.

[4] This issue is within the limited scope of defendants' Rule 23(f) appeal because we consider "Article III standing as a necessary threshold issue to our review" of a class certification order. McNair v. Synapse Grp. Inc., 672 F.3d 213, 223 n.10 (3d Cir. 2012).

14

contains three elements," the first of which is that "the plaintiff must have suffered 'an injury in fact'").

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1548 (2016) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. at 2136). But the Supreme Court has emphasized that an intangible injury may be sufficiently concrete so that its redress will satisfy the injured party's standing requirement. Id. at 1549.

We have applied this principle. See In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 273 (3d Cir. 2016), cert. denied sub nom. C. A. F. v. Viacom Inc., 137 S.Ct. 624 (2017) (mem.). In Nickelodeon, we held that the plaintiffs — who had alleged a "perhaps intangible" harm when their legally protected information was unlawfully disclosed on the internet — had pled facts sufficient to establish Article III standing.[5] Id. at 273-74 (internal quotation marks omitted); see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 134-35 (3d Cir. 2015), cert. denied sub nom. Gourley v. Google, Inc., 137 S.Ct. 36 (2016) (mem.) (finding that plaintiffs had shown injury in fact when they made "highly specific allegations that the defendants, in the course of serving advertisements to their personal web browsers, implanted tracking cookies on their personal computers," explaining that "[t]o the extent that the defendants believe[d] that the alleged conduct implicate[d]

---

[5] The information allegedly included data collected from minors accessing the internet, such as children's genders, birthdates, browser settings, IP addresses, and web communications. Nickelodeon, 827 F.3d at 269.

interests that are not legally protected, this is an issue of the merits rather than of standing"). We have stated that focusing on "economic loss" in determining whether a plaintiff has Article III standing is "misplaced." Nickelodeon, 827 F.3d at 272-73 (quoting Google, 806 F.3d at 134).

We are satisfied that Taha has shown for standing purposes that he suffered an injury in fact. Like the plaintiffs in Nickelodeon and Google, he claims to have been "intangibly" but personally and actually injured when his arrest information and booking photograph were publicly disseminated. He testified in a deposition that he suffered from humiliation, sadness, and embarrassment as a result of the posting; and lost sleep and weight after he discovered the listing. Regardless of the ultimate outcome on the class's punitive damage claim, Taha has claimed a sufficiently particularized and concrete injury to demonstrate that he has Article III standing.

2. "Aggrieved" Standing

Defendants next argue that Taha was not "aggrieved" as the CHRIA statutory scheme requires to recover damages and therefore that he is not an appropriate class representative. See Appellants' br. at 21 (arguing that if Taha "is not 'aggrieved' . . . [he] is not entitled to maintain a punitive damages claim under CHRIA even on behalf of himself, much less a class of 66,799 offenders").

CHRIA requires that a person be "aggrieved" to recover compensatory damages under the statute but it does not specify the injuries that can cause actual and real damages. See 18 Pa. Cons. Stat. § 9183(b)(2) (providing that "[a] person found by the court to have been aggrieved by a violation of this chapter or the

16

rules or regulations promulgated under this chapter" can receive certain forms of relief). However, the Pennsylvania Supreme Court has held that "[a] party is aggrieved if he can demonstrate that he has a substantial, direct, and immediate interest in the outcome of the litigation." Pa. Gaming Control Bd. v. City Council of Phila., 928 A.2d 1255, 1265-66 (Pa. 2007). As that court has explained:

> A 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A 'direct' interest requires a showing that the matter complained of caused harm to the party's interest. An 'immediate' interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it.

In re Hickson, 821 A.2d 1238, 1243 (Pa. 2003) (citation omitted).

But the Pennsylvania court has not required that this interest be pecuniary. Wm. Penn Parking Garage, Inc. v. City of Pittsburgh, 346 A.2d 269, 281 (Pa. 1975) ("[I]t is clear that some interests will suffice to confer standing even though they are neither pecuniary nor readily translatable into pecuniary terms."). Defendants do not satisfactorily explain why Taha fails to have a "substantial, direct, and immediate interest in the outcome of the litigation" beyond their arguments in the Article III standing context. Taha makes a plausible argument that defendants caused him to suffer harm unique to him rather than

17

causing general harm common to all individuals after defendants released information about his expunged arrest. Moreover, Taha asserts that there was a causal connection between defendants' actions and his harm. Thus, Taha has sufficiently pleaded that he has been aggrieved under CHRIA to serve as a class representative.

### 3. Availability of Punitive Damages Without Compensatory Damages

The parties disagree on the answer to the question of whether the District Court could certify a class for punitive damages after it found that the class representative was not entitled to compensatory damages. In certifying the class, the Court concluded that the only question left in the case was a class-wide question about "the County Defendants' willfulness" in its actions violating CHRIA because Taha did not have a valid claim for "actual and real damages." J.A. at 9a. Thus, the Court premised its class certification decision on its holding that Taha could recover punitive damages even though he could not recover compensatory damages.

When the District Court held that punitive damages could be imposed under CHRIA even though Taha had not suffered compensatory damages, it relied on a Pennsylvania Supreme Court case which addressed "whether punitive damages must bear a reasonable relationship to compensatory damages which are awarded." Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 801 (Pa. 1989). In addressing this question, the Kirkbride court explained that although "punitive damages must, by necessity, be related to the injury-producing cause of action[,] [t]his does not mean . . . that specific compensatory damages must be awarded to sustain a punitive damages award." Id. at

18

802. In a case where "compensatory damages had not been awarded, punitive damages could be appropriate, the critical factor being the establishment of sufficient evidence to sustain the cause of action." Id. at 803.

The court in Kirkbride distinguished its prior opinion in Hilbert v. Roth, 149 A.2d 648 (Pa. 1959), in which a plaintiff was unsuccessful when he "attempted to pursue an independent cause of action for punitive damages since the cause of action for compensatory damages had been dismissed." Id. at 802. The Kirkbride court observed that in Hilbert there was "no cause of action upon which the plaintiff could claim punitive damages" after "the underlying cause of action was dismissed."[6]

---

[6] In all the Pennsylvania state court cases which defendants cite to refute the theory that punitive damages can be recovered in the absence of compensatory damages, there was not a cause of action supporting the recovery of punitive damages alone. See Smith v. Grab, 705 A.2d 894, 901 (Pa. Super. Ct. 1997) (finding that although a punitive damages issue was not "ripe for review," "the entry of a nonsuit [against the plaintiff] by the trial court precluded the recovery of compensatory damages; thus, punitive damages were foreclosed as well" because the plaintiff did not have a remaining cause of action on which to rely); Schecter v. Watkins, 577 A.2d 585, 595 (Pa. Super. Ct. 1990) (stating that where the jury entered a "verdict of non-liability" for the defendants and accordingly "no actual damages [were] sustained," punitive damages could not be recovered because they "must arise out of liability on the cause of action" and be "an element of damages flowing therefrom").

Defendants cite our opinion in Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715 (3d Cir. 1991), rendered after

19

Id.  It contrasted this scenario with one in which "liability was determined on the facts and [solely] punitive damages were awarded predicated upon the finding of liability."  Id.

In considering the relevant statutory language in this case we build on our understanding that, under Pennsylvania law, a court may impose punitive damages even if the plaintiff has not suffered compensatory damages provided that there is a cause of action to support the imposition of punitive damages.  The civil penalties section of CHRIA states that:

> A person found by the court to have been aggrieved by a violation of this chapter or the rules or regulations promulgated under this chapter, shall be entitled to actual and real damages of not less than $100 for each violation and to reasonable costs of litigation and attorney's fees.  Exemplary and punitive damages of not less than $1,000 nor more than $10,000 shall be imposed for any violation of this chapter, or the rules or regulations adopted under this chapter, found to be willful.

§ 9183(b)(2).  Unlike in other cases in which courts must grapple with the question of whether there can be a cause of action for punitive damages, CHRIA provides for the imposition

Kirkbride to support their position.  Appellants' reply br. at 24.  However, Tunis' limited mention of this issue included a citation to a 1984 case, Emerick v. U.S. Suzuki Motor Corp., 750 F.2d 19 (3d Cir. 1984), that relied on Hilbert, which Kirkbride distinguished.  See Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800, 802 (Pa. 1989).

of punitive damages without any explicit language linking the imposition of punitive damages to the recovery of actual and real damages. Although any underlying cause of action to support imposition of punitive damages has as an element the presence of an aggrieved plaintiff — a threshold standing requirement — as well as a violation of the statute and, for the imposition of punitive damages, a finding of a defendant's willfulness, the plain statutory language does not condition the imposition of punitive damages on a plaintiff's recovery of compensatory damages.

Defendants argue that it would be "absurd" for at least $1,000 in punitive damages to be imposed, the minimum recovery for punitive damages under CHRIA for a CHRIA willful violation, inasmuch as the District Court already has found that Taha is not entitled to any actual and real damages for the violation, not even the statutory minimum amount of $100.[7] Appellants' br. at 21, 24-25. They argue that such an

_____

[7] In their reply brief, defendants rely extensively on an interpretation of the federal Privacy Act by the Supreme Court to support this point, but the case they cite involved a different question from the one before us. See Appellants' reply br. at 16-18 (citing FAA v. Cooper, 566 U.S. 284, 132 S.Ct. 1441 (2012)). In Cooper, the Supreme Court considered whether the Privacy Act allowed the recovery of damages for mental and emotional distress under the Act's "actual damages" provision, holding that it did not. 566 U.S. at 304, 132 S.Ct. at 1456. It did not address punitive damages, let alone the availability of statutory punitive damages when a plaintiff has suffered mental and emotional harm without accompanying "actual and real" damages under a statute like CHRIA.

21

interpretation would be contrary to legislative intent, although they do not cite any relevant legislative history or evidence specifically about the purpose of CHRIA to support their argument.  See id. at 23-25.

Taha responds that CHRIA plainly shows that even though it could have done so, the Pennsylvania legislature did not condition the imposition of punitive damages under CHRIA on the plaintiff's recovery of compensatory damages. Appellee's br. at 45.  Taha also notes that the District Court has not yet determined what action constitutes a "violation" of CHRIA — each individual internet posting, the single decision to upload the information, or some other action or actions.  Id. at 46-47.  At oral argument on Taha's motion for class certification, the District Court suggested that it was possible that "the decision to put all the records on the lookup tool was one violation."  J.A. at 2174a.  While defendants and their supporting amicus curiae make dire predictions about the potential financial burdens on Pennsylvania taxpayers from the class certification, these arguments are premature as the District Court has not made any decision regarding what conduct constitutes a violation or violations.[8]

---

[8] The amicus curiae brief filed by the County Commissioners Association of Pennsylvania ("CCAP") presents some potential calculations of a punitive damages range, based on assumptions it makes about what would constitute a "violation" of CHRIA in this case.  See CCAP Amicus Curiae br. at 7-9.  Nevertheless, we are confident that even if the class is successful in advancing its contention that punitive damages should be imposed on defendants, the District Court or this Court on appeal will apply CHRIA so that any punitive damages imposed would be

Punitive damages serve a different purpose than compensatory damages inasmuch as in the tort context, they generally are imposed "to punish . . . for outrageous conduct and to deter . . . from similar conduct." Hutchison ex rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005). In the penalties provision of CHRIA, the Pennsylvania legislature explicitly provided for the imposition of punitive damages without including any language making the recovery of compensatory damages a prerequisite for their imposition. Because punitive damages are imposed for a different purpose than compensatory damages, we cannot say that it would be "absurd" or "unreasonable," as defendants suggest, to read the statute to permit the imposition of punitive damages in the absence of compensatory damages so long as there is a cause of action to support the imposition of punitive damages.

Given the particular harms that can be wrought by the release of someone's criminal history information, there may be instances in which an individual faces consequences beyond humiliation and embarrassment which may be difficult or impossible to evaluate in monetary terms. See Community Legal Services Amicus Curiae br. at 7, 14 (outlining how "[i]ndividuals are routinely denied employment, housing, and education opportunities due to their criminal records, however minor they may be," and suffer adverse treatment by entities or individuals who rely on "non-conviction data"). CHRIA on its face permits the imposition of punitive damages on defendants who willfully cause this type of harm. Thus, we cannot

reasonable. After all, the Pennsylvania legislature cannot have intended to provide for the imposition of unreasonable punitive damages. In any event, the question of how damages under CHIRA are calculated and allocated is not before us.

23

conclude that the District Court erred when it based its class certification order on its conclusion that punitive damages could be imposed under CHRIA even if Taha could not recover compensatory damages.

### 4. Availability of Punitive Damages Against Government Agencies

Defendants also argue that inasmuch as they are government agencies, the District Court erred when it certified a punitive damages class that could proceed against them. Appellants' br. at 35-41. The Court did not address this issue when making its class action certification decision. But the Court earlier had considered whether punitive damages could be imposed on a government agency when the Court addressed the summary judgment motions for at that time it relied on its prior conclusion on a motion to dismiss that CHRIA authorizes the imposition of damages against government agencies. It therefore held that CHRIA includes a legislatively targeted waiver of sovereign immunity. See J.A. at 23a-24a. The Court reasoned that:

> [T]here is no precedent for the proposition that punitive damages imposed pursuant to CHRIA are inapplicable to state agencies. . . . As discussed at length in Taha I, several Pennsylvania courts have also held or assumed that CHRIA provides for damages against governmental units. Thus, this Court predicted in Taha I that the Pennsylvania Supreme Court would find that CHRIA 'demonstrates a clear legislative intent to hold government entities liable for damages for violation of section 9121.' Without further

24

guidance from the Pennsylvania Supreme Court . . . this prediction is unchanged.

Id. (citations omitted). The status of this case requires us to address the question of whether punitive damages can be imposed on a government agency in order to determine whether, depending on the facts of the case, it would be proper to certify a class solely for the purpose of potentially imposing punitive damages on such agencies under CHRIA.

The Pennsylvania Supreme Court has stated that as a general rule, "government agencies have been exempt from the imposition of punitive damages." Feingold v. Se. Pa. Transp. Auth., 517 A.2d 1270, 1276 (Pa. 1986). Punitive damages generally are prohibited "unless expressly authorized by statute." City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 260 n.21, 101 S.Ct. 2748, 2756 n.21 (1981).

Defendants argue that CHRIA does not include a sufficiently "express" authorization for punitive damages to be imposed against government agencies. They argue that CHRIA lacks such authorization because each section of CHRIA does not include its own penalties provision stating that punitive damages may be imposed for a violation of that provision but CHRIA includes only a separate penalties provision. They also argue that the penalties provision does not expressly allow punitive damages to be imposed on a government agency.

We disagree. On its face, CHRIA applies to "persons within this Commonwealth and to any agency of the Commonwealth or its political subdivisions which collects, maintains, disseminates or receives criminal history record information." 18 Pa. Cons. Stat. § 9103. Although the statute

25

does not define an "agency," it states that

> [c]riminal justice agencies include, but are not limited to: organized State and municipal police departments, <u>local detention facilities, county, regional and State correctional facilities</u>, probation agencies, district or prosecuting attorneys, parole boards, pardon boards, the facilities and administrative offices of the Department of Public Welfare that provide care, guidance and control to adjudicated delinquents, and such agencies or subunits thereof, as are declared by the Attorney General to be criminal justice agencies as determined by a review of applicable statutes and the State and Federal Constitutions or both.

<u>Id.</u> § 9102 (emphasis added). It is difficult to understand how a more expansive definition of a criminal justice agency could be written.

The majority of CHRIA's provisions govern the conduct of government agencies in relation to the collection, management, use, or dissemination of criminal history record information.[9] <u>See, e.g.</u>, <u>id.</u> §§ 9111, 9113-14, 9121, 9124, 9131, 9141, 9171. Section 9181 of CHRIA provides that "[a]ny person, including any agency or organization, who violates the

---

[9] There are exceptions to these rules in sections governing the use of criminal records by employers and the right of an individual to access and review information about the individual's own criminal history record. <u>See</u> 18 Pa. Cons. Stat. §§ 9125, 9151, 9153.

provisions of this chapter or any regulations or rules promulgated under it may . . . [b]e subject to civil penalties or other remedies as provided for in this chapter." This language does not limit CHRIA's available remedies to situations in which there have been violations of only certain of its provisions. As we quoted above in relevant part, CHRIA's civil penalties provision states that "[a] person found by the court to have been aggrieved by a violation of this chapter or the rules or regulations promulgated under this chapter" can recover "actual and real damages" and possibly "[e]xemplary and punitive damages," if they are imposed. Id. § 9183.

The section under which Taha brought his suit — section 9121 — provides that "[c]riminal history record information shall be disseminated by a State or local police department to any individual or noncriminal justice agency only upon request." It states that before any information is disseminated, certain information must be removed from the record; specifically, "[a]ll notations of arrests, indictments or other information relating to the initiation of criminal proceedings where: (A) three years have elapsed from the date of arrest; (B) no conviction has occurred; and (C) no proceedings are pending seeking a conviction" as well as "[a]ll information relating to a conviction and the arrest, indictment or other information . . . which is the subject of a court order for limited access." Id. § 9121(b)(2).

But section 9121 does not contain limitations indicating that "any agency or organization" found in violation of that provision, per section 9181, would not be subject to the expressly outlined penalties imposed under section 9183.[10] To

_____

[10] Defendants argue that section 9121 of CHRIA does not

27

the contrary, the clear language of the statute, read in its entirety, indicates that the Pennsylvania legislature intended individuals to be able to recover damages, possibly including punitive damages, against government entities willfully violating CHRIA. We need not look beyond this language to make this determination inasmuch as defendants do not provide us with persuasive authority to the contrary.[11]

include an express waiver of sovereign immunity for the purposes of imposing punitive damages on government entities because only one section of the statute — section 9106 — contains a "penalties" provision applicable to the section in which it is contained, and § 9121 does not contain any similar provision. But it would render the plain language of CHRIA's general penalties provision nonsensical if we read it to apply solely to section 9106. After all, both sections 9181 and 9183 refer to violations of "the provisions of this chapter." See 1 Pa. Cons. Stat. § 1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."); id. § 1922(1) ("[T]he General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.").

[11] The only Pennsylvania case defendants cite that discusses the imposition of punitive damages under CHRIA merely noted in remanding the case to the Commonwealth Court that "while our case law suggests the Commonwealth may be exempt from the imposition of punitive damages, the Commonwealth Court did not develop its reasoning concerning the denial of punitive damages [in that case], even in light of the terms of the statute which provides for such a remedy." Hunt v. Pa. State Police of Commonwealth, 983 A.2d 627, 639 (Pa. 2009) (citations omitted) (emphasis added). The case on which the Pennsylvania

28

We thus conclude that CHRIA permits Taha and the certified class to pursue their case seeking to impose punitive damages against defendants. Although we are mindful that this decision recognizes that punitive damages may be imposed on government defendants, we are confident that the District Court will ensure that any award of punitive damages, if there is one, is reasonable and proportionate to the wrong committed, particularly inasmuch as that Court has not yet determined what conduct constitutes a "violation" of CHRIA.

5. Predominance

Finally, defendants contest the District Court's certification of a punitive damages only class because they contend that the consideration of the amount of punitive damages to impose "necessarily raise[s] individualized issues," preventing the action from meeting the predominance requirement of Rule 23(b)(3). Appellants' br. at 26. But the Court found after granting partial summary judgment for Taha on liability that the only remaining question of fact was whether defendants' actions were "willful," an issue which

Supreme Court relied for its suggestion that government entities may be exempt from the imposition of punitive damages involved a common law claim based on the alleged breach of a collective bargaining agreement. See City of Phila. Office of Hous. & Cmty. Dev. v. AFSCME, 876 A.2d 375 (Pa. 2005). Thus, Hunt differs from the case before us because here there is targeted legislation primarily regulating the actions of government agencies in their management and dissemination of criminal history record information and the legislation includes an explicit punitive damages provision.

29

"predominates over any individual issues of its potential members." See J.A. at 9a.

Neither Taha nor defendants provide any binding authority from the Supreme Court or this Court concerning the availability or boundaries of the certification of a class solely for the purpose of the imposition of punitive damages.[12] The District Court did not address this issue, and the Federal Rules of Civil Procedure say nothing specifically either prohibitive or permissive with respect to this point. We therefore must consider this question by analyzing the "predominance" prong of Rule 23(b)(3), on which defendants focus on appeal.

A court certifying a class under Federal Rule of Civil Procedure 23(b)(3) must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." The Supreme Court has explained that:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.

---

[12] Rather, they rely on opinions from the Court of Appeals for the Fifth Circuit and nonprecedential opinions, one from the Court of Appeals for the Fourth Circuit and the rest from various district courts. See Appellants' br. at 26-30; Appellee's br. at 54-55; Appellants' reply br. at 31-32.

30

Tyson Foods, Inc. v. Bouaphakeo, 136 S.Ct. 1036, 1045 (2016) (internal quotation marks omitted). Thus, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997). To determine this level of cohesion, "the predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 359 (3d Cir. 2013). "The predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations . . . overwhelm questions common to the class.'" In re Modafinil Antitrust Litig., 837 F.3d 238, 260 (3d Cir. 2016) (alteration in original) (quoting Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433 (2013)).

The District Court found that the predominance prong of the class action rule had been met because it had "already held that the County Defendants improperly published CHRIA protected information on the Inmate Lookup Tool" and thus "[t]he only question remaining in this case concerns the award of punitive damages," a question that turned on whether defendants' actions in posting the criminal history record information were "willful." J.A. at 9a. Therefore, the Court concluded that "[t]he class-wide question of fact as to the County Defendants' willfulness predominates over any individual issues of its potential members." Id.

Defendants argue that the District Court erred because it did not examine how the impact of the disclosure could undermine the damages calculation on a class-wide basis. In

this regard, we point out that CHRIA does not provide a standard punitive damages amount but instead provides for a range of damages between $1,000 and $10,000 "for any violation." § 9183(b)(2). Under Pennsylvania tort law, "the nature and extent of the harm" caused by a defendant is one of three factors a fact-finder may consider in determining the amount of punitive damages. Kirkbride, 555 A.2d at 803. Defendants contend that the existence of this permissible factor — one of several that a fact-finder may consider — dooms the class's ability to meet predominance.

However, our core analysis on the predominance issue focuses on whether the class can meet the "essential elements" of its claims "with common, as opposed to individualized, evidence." See Hayes, 725 F.3d at 359. At this stage of the proceedings in this case, the only remaining factual issue is whether defendants willfully violated CHRIA. Clearly, the trier of fact should be able to determine whether a violation was "willful" by considering common evidence regarding defendants' actions and intent without taking into account information regarding the individual class members. After all, the class members played no role when defendants released the information about them by posting it online. A determination of the "essential element" in this case centers on common acts by defendants and perhaps their states of mind. Because any "actual and real" damages suffered by individual class members cannot be considered in this case as the class was not certified for the purpose of making such determinations, the impact of defendants' actions on individual plaintiffs has no bearing on the remaining essential element in this case, i.e., defendants' willfulness. Therefore, the District Court did not make an error when it found that the predominance factor had been met.

## V. CONCLUSION

For the foregoing reasons, we will affirm the District Court's May 4, 2016 order certifying a class in this case.