**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2980
_____

IN RE: JOHNSON & JOHNSON TALCUM POWDER
PRODUCTS MARKETING, SALES PRACTICES AND
LIABILITY LITIGATION

Mona Estrada,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court Nos. 3-16-cv-07492 and 3-16-md-02738
District Judge: The Honorable Freda L. Wolfson

Argued June 14, 2018

Before: SMITH, *Chief Judge,* CHAGARES, and
FUENTES, *Circuit Judges*

(Filed: September 6, 2018)

Timothy G. Blood                    **[ARGUED]**
Blood Hurst & O'Reardon
501 West Broadway
Suite 1490
San Diego, CA 92101

Charles L. Gould
Alison D. Hawthorne
W. Daniel Miles, III
Beasley, Allen, Crow, Methvin, Portis & Miles
218 Commerce Street
Montgomery, AL  36104
        *Counsel for Appellant*



Adam M. Kaplan
Matthew D. Powers                    **[ARGUED]**
James K. Rothstein
O'Melveny & Myers
Two Embarcadero Center
28th Floor
San Francisco, CA  94111
        *Counsel for Appellee*

———————————

OPINION

———————————

2

SMITH, *Chief Judge*.

The question presented in this appeal from a dismissal of a class action is both narrow and novel: Has a plaintiff—who has entirely consumed a product that has functioned for her as expected—suffered an economic injury solely because she now sincerely wishes that she had not purchased that product? We hold that such a plaintiff has not suffered an economic injury sufficient to bring a claim in federal court. More succinctly, buyer's remorse, without more, is not a cognizable injury under Article III of the United States Constitution.

A plaintiff alleging an economic injury as a result of a purchasing decision must do more than simply characterize that purchasing decision as an economic injury. The plaintiff must instead allege facts that would permit a factfinder to determine, without relying on mere conjecture, that the plaintiff failed to receive the economic benefit of her bargain. Because the plaintiff here has failed to plead facts sufficient to establish economic harm, the District Court's judgment will be affirmed.

## I. BACKGROUND

Plaintiff Mona Estrada alleges that a woman's perineal use of Defendant Johnson & Johnson's Baby Powder can lead to an increased risk of developing ovarian

3

cancer. JA 47. Without question, that is a serious allegation. Yet the validity of Plaintiff's epidemiological theory is not for this court to decide.[1] Nonetheless, because Estrada has artfully woven that serious allegation into her complaint—despite it having little connection to the alleged economic injury that forms the basis of her claim—we must begin our discussion by carefully describing what this case is *not* about.

First, Plaintiff does not allege that a product has caused her physical injury.[2] Estrada does not allege that she has ovarian cancer, nor does she allege even an increased risk of developing cancer. Second, this case makes no claim of emotional injury. Estrada does not allege, for example, that she suffers from a fear of

---

[1] "When reviewing an order of dismissal for lack of standing, we accept as true all material allegations of the complaint and construe them in favor of the plaintiff." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 288 (3d Cir. 2005) (quoting *Conte Bros. Auto., Inc. v. Quaker State–Slick 50, Inc.*, 165 F.3d 221, 224 (3d Cir. 1998)).

[2] JA 49–50 ("Plaintiff is not claiming physical harm or seeking the recovery of personal injury damages."). Excluded from Estrada's proposed class definition are individuals "who assert claims from personal injury." JA 71.

someday developing ovarian cancer. Third, this case does not involve allegations of a defective product. Estrada purchased Baby Powder labeled as being "designed to gently absorb excess moisture," and marketed as being able to "keep[] skin feeling soft, fresh and comfortable," and help "reduce the irritation caused by friction." JA 52. She does not allege that her powder failed to adequately perform any of these functions.[3] Fourth, this case does not involve a durable product still in a plaintiff's possession. Instead, the complaint concerns a nondurable product that has already been consumed in its entirety.[4] Estrada does not, for example, seek to be reimbursed for powder that she still possesses but cannot use. Finally, this case does

---

[3] Nor could Estrada credibly make such an allegation. She continued to purchase the powder for approximately six decades—presumably because it worked. *See* JA 49 (alleging that Estrada purchased Defendant's baby powder "[f]rom about 1950 to sometime in 2013").

[4] By "nondurable," we refer to a product that is consumed rather quickly—such as a gallon of gasoline. By contrast, a "durable" product is one that is consumed over a much longer period of time—such as a new automobile. A plaintiff who, for example, alleged that her automobile was at risk of imminently malfunctioning because of a particular defect would present a much different question than the one at hand.

5

not involve any number of other economic theories that might confer Article III standing on other plaintiffs. For instance, Estrada does not seek to be reimbursed for medical monitoring expenses, nor does she seek to recoup transaction costs associated with reselling or returning Baby Powder.

What, then, *does* Estrada allege? Her theory of recovery is simply that she suffered an economic injury by *purchasing* improperly marketed Baby Powder. JA 49. According to Estrada, had she been properly informed that using Baby Powder could lead to an increased risk of developing ovarian cancer, she would not have purchased the powder in the first place. JA 49, 70. Characterizing this as an economic injury, she seeks relief for herself and a class of similarly situated consumers.[5]

Estrada first brought this lawsuit in the United States District Court for the Eastern District of California. JA 46. On March 27, 2015, that court dismissed Estrada's complaint for lack of Article III standing. Estrada Br. 7.

---

[5] Estrada seeks certification of a class defined as "All persons who purchased [Johnson & Johnson] Baby Powder in California and states with laws that do not conflict with the laws asserted here." JA 71. However broad this proposed definition, apparently covering even men (who are obviously incapable of developing ovarian cancer), we are not presented with issues arising under Rule 23 of the Federal Rules of Civil Procedure.

6

Estrada then filed an amended complaint, but before the Eastern District of California could rule on that complaint, the case was consolidated as part of a Multidistrict Litigation proceeding and transferred to the United States District Court for the District of New Jersey (the "District Court"). JA 44; Estrada Br. 7.

On July 14, 2017, the District Court dismissed Estrada's complaint without prejudice for lack of Article III standing, and granted her leave to amend. JA 5. After Estrada informed the District Court that she chose not to amend and would stand on her complaint, the District Court dismissed the case on August 10, 2017. JA 4.

In concluding that Estrada did not have Article III standing, the District Court explicitly considered whether Estrada's allegations fell within any one of three different theories of economic injury: (1) alternative product; (2) premium price; and (3) benefit of the bargain. JA 16–17. Estrada challenges this tripartite analysis, contending that the District Court inappropriately funneled her allegations into "one of three assumed damage methodologies." Estrada Br. 7. But Estrada was not restricted to the three theories considered by the District Court; she was free to present additional theories of her own—particularly by amending her complaint when the District Court offered her the opportunity to do so. In examining Estrada's complaint through the lens of three different theories of injury, the District Court merely fulfilled its duty to

7

"examine the allegations in the complaint from a number of different angles" in order to see if the "purported injury can be framed in a way that satisfies Article III." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 197 (3d Cir. 2016).

Under the alternative product theory, a plaintiff might successfully plead an economic injury by alleging that, absent the defendant's conduct, she would have purchased an alternative product that was less expensive. Under this theory, the economic injury could be calculated by determining the difference in price between the defendant's more expensive product and the less expensive alternative. Portions of Estrada's complaint can reasonably be read as an attempt to allege this very theory of injury. Her complaint states, for example, that had she "known the truth about the safety of using [Johnson & Johnson's talc-based Baby Powder], she would not have purchased the product," but instead "would have purchased an alternative product containing cornstarch instead of talc." JA 49.[6] According to Estrada's complaint,

---

[6] As explained in Estrada's complaint, Johnson & Johnson's "Baby Powder is made entirely of talc and fragrance. Talc is a mineral composed of hydrated magnesium silicate that is mined from the earth. It is an inorganic material. Talc is used to manufacture goods, such as paper making, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose

"alternative powder products that are cornstarch[-]based . . . do not pose a risk of ovarian cancer and are otherwise functionally the same as talc products." JA 54. Upon considering these allegations, the District Court concluded that Estrada could not avail herself of the alternative product theory because she failed "to allege that a cornstarch-based product would have been *cheaper*." JA 30. In other words, paying *less* for Baby Powder than an alternative would not constitute an economic injury.

Under a second theory analyzed by the District Court, the premium price theory, a plaintiff may plead an economic injury by alleging that the defendant unlawfully advertised its product as being "superior" to others. Applying this approach, economic injury is calculated as the unfair "premium" that the plaintiff was unlawfully induced to pay. The District Court concluded that Estrada did not sufficiently allege an economic injury under this theory because she did not claim that Johnson & Johnson "advertised Baby Powder as superior to other products," nor did she allege that "she would not have paid a premium for Baby Powder" but for such advertisements. JA 35. In other words, Estrada identified no unlawful "premium."

Estrada concedes that her claims do not fall within either the alternative product or premium price theories of economic injury. Estrada Br. 25 ("Estrada's injury in this

form and as used in the Baby Powder, talc is known as 'talcum powder.'" JA 54.

9

case does not depend on her ability to purchase an alternative product at a cheaper price."); *id.* at 26 ("[T]he district court's 'premium price' methodology has nothing to do with Estrada's claims."); Reply Br. 12 ("The District Court's 'Alternative Product' and 'Price Premium' Theories Are Irrelevant"). Indeed, Estrada has failed to identify either a cheaper alternative or an unlawful premium. Any economic injury she may have suffered, then, must be conceptualized by applying some other theory of injury. Accordingly, the third theory of injury analyzed by the District Court, the benefit of the bargain theory, merits our attention.

Under the benefit of the bargain theory, a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value. The economic injury is calculated as the difference in value between what was bargained for and what was received. The District Court concluded that Estrada's allegations also failed to fit within this theory of harm because she purchased and received Baby Powder that successfully did what the parties had bargained for and expected it to do: eliminate friction on the skin, absorb excess moisture, and maintain freshness. JA 17–18, 29–30. On appeal, Estrada rejects the significance of the Baby Powder performing these functions. She contends that although she received Baby Powder that eliminated friction on the skin, absorbed excess moisture, and maintained freshness, she was also

promised that the Baby Powder would be "safe." Instead, Estrada contends, the product was "unsafe." Estrada Br. 19–20. We focus, then, on this contention and consider whether Estrada has successfully alleged an economic injury sufficient to confer Article III standing.[7]

## II. STANDING JURISPRUDENCE

Article III of our Constitution vests "[t]he judicial power of the United States" in both the Supreme Court and "such inferior courts as the Congress may from time to time ordain and establish." U.S. Const. art. III., § 1. While Article III does not outline the exact contours of this "judicial power," the Constitution "does specify that this power extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting U.S. Const. Art. III, § 2). In order to avoid violating this "Cases and Controversies" limitation, a party seeking to invoke the federal judicial power must first establish that they have "standing" to do so. *Id.*[8] This

---

[7] "We exercise plenary review over a dismissal for lack of standing." *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 161 (3d Cir. 2017)

[8] Although Article III does not explicitly refer to "standing," the judicial doctrine derives from the principle of separation-of-powers. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from

11

standing requirement "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," and "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Id.*

To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the

being used to usurp the powers of the political branches."); John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1226 (1993) ("If Congress directs the federal courts to hear a case in which the requirements of Article III are not met, that Act of Congress is unconstitutional. . . . [T]he conclusion that Article III limits congressional power can hardly be regarded as remarkable."); Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 881 (1983) ("My thesis is that the judicial doctrine of standing is a crucial and inseparable element of th[e] principle [of separation-of-powers], whose disregard will inevitably produce—as it has during the past few decades—an overjudicialization of the processes of self-governance."). While Estrada presents theories of harm that rest upon California law rather than a statute enacted by Congress, the constitutional limitations imposed on our jurisdiction remain the same. Federal courts are not at liberty to opine on state law absent Article III jurisdiction.

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. This appeal focuses on the "'[f]irst and foremost' of standing's three elements," injury in fact. *Id*. (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). Satisfying the injury in fact element requires the party seeking to invoke federal jurisdiction to establish three sub-elements. *Mielo v. Steak 'n Shake*, 897 F.3d 467, ___ n.11 (3d Cir. 2018). First, the party must "show that he or she suffered 'an invasion of a legally protected interest.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Second, the party must show that the injury is both "concrete and particularized." *Id*. Finally, the party must show that his or her injury is "actual or imminent, not conjectural or hypothetical." *Id*.

Because Estrada is the party seeking to invoke federal jurisdiction, "[t]he burden to establish standing" rests with her. *Finkelman*, 810 F.3d at 194. Indeed, she specifically "bears the burden of showing that [s]he has standing for *each* type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis added). Because Estrada seeks relief in the form of (1) monetary damages, (2) restitution, and (3) injunctive relief, JA 79, our standing inquiry will consider, in turn, whether Estrada has established standing to seek these three categories of relief.

13

### III. MONETARY DAMAGES

In considering whether Estrada has standing to seek monetary damages, we focus our analysis on two recent Article III standing opinions from this Court: *Finkelman v. National Football League*, 810 F.3d 187 (3d Cir. 2016), and *Cottrell v. Alcon Laboratories*, 874 F.3d 154 (3d Cir. 2017). These precedential opinions represent two sides of the same coin. And in each, we considered whether the plaintiffs' theory of economic injury was too conjectural to establish standing.

While in *Cottrell* we concluded that the plaintiffs' economic theory of harm was based on more than mere conjecture, in *Finkelman* we concluded just the opposite. The two holdings can be harmonized, however, to provide a clear lesson: a plaintiff must do more than offer conclusory assertions of economic injury in order to establish standing. She must allege facts that would permit a factfinder to value the purported injury at something more than zero dollars without resorting to mere conjecture. Accordingly, Estrada must do more than simply characterize her Baby Powder purchases as economic injuries; she must allege facts that would permit a factfinder to determine that the economic benefit she received in purchasing the powder was worth less than the economic benefit for which she bargained. A brief description of the holdings in *Finkelman* and *Cottrell* brings this lesson into focus.

14

In *Finkelman*, two plaintiffs alleged that the National Football League ("NFL") had a ticketing policy of reserving tickets for League Insiders that resulted in Super Bowl tickets being priced higher than they would have been had the NFL offered to sell more tickets to the general public. *Finkelman*, 810 F.3d at 190. We concluded that one of the plaintiffs in that case, Hoch–Parker, had not suffered an economic injury sufficient to confer Article III standing. *Id.* at 196. That was because Hoch–Parker had not even attempted to purchase Super Bowl tickets; he had only considered the possibility of doing so. *Id.* at 195–96.

A second plaintiff, Finkelman, presented a closer case because he alleged that he had actually purchased Super Bowl tickets. *Id.* at 197. We therefore examined his allegations through the lens of two different theories of economic injury. Under the first theory, Finkelman alleged that the NFL's ticket policy injured him by preventing him from successfully purchasing a ticket at face value in a ticket lottery. *Id.* But because Finkelman never entered that lottery, we concluded that this economic theory failed to afford a basis for standing. *Id.* at 199. His failure to even attempt to purchase a ticket through the lottery meant that "there was always a *zero* percent chance that he could procure a face-price ticket." *Id.* at 198. Any economic harm that Finkelman might have suffered as a result of not purchasing Super Bowl tickets through the lottery was therefore not attributable to the NFL's conduct. *Id.*

15

Although Finkelman did not participate in the ticket lottery, he *did* allege that he purchased tickets in a secondary market where tickets from the lottery were resold. *Id.* at 199. Under a different economic theory, then, Finkelman contended that the NFL's ticket policy inflated the price of tickets on the resale market in which he had participated. *Id.* at 199. In particular, Finkelman alleged that had the NFL originally released more tickets for sale to the general public, there would have been greater availability of such tickets on the resale market. *Id.* at 199–200. That increase in supply, he claimed, would have resulted in a reduction in price. *Id.*

Finkelman contended that his economic injury could be calculated as the difference between what he actually paid, and what he claimed he should have paid had the NFL released more tickets to the general public. *Id*. We concluded that this theory failed to provide Finkelman with standing, since "League [I]nsiders . . . had the same incentive to resell their tickets as the unnamed broker who sold Finkelman *his* two tickets." *Id.* at 200. In recognizing that economic incentive, we explained that "while it *might* be the case that the NFL's withholding [of tickets] increased ticket prices on the resale market, it might *also* be the case that it had no effect on the resale market." *Id*.[9]

---

[9] We further noted that the NFL's withholding of "tickets from the general public . . . might have even *increased* the

16

In summarizing the issue with Finkelman's second economic theory of injury, we explained that "we have no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market. We can only speculate—and speculation is not enough to sustain Article III standing." *Id.* Although we noted that courts often "credit allegations of injury that involve no more than 'application of basic economic logic,'" *Id.* at 201 (quoting *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989)), we further explained that "there is a difference between allegations that stand on well-pleaded facts and allegations that stand on nothing more than supposition." *Id.* Cognizant that "even at the pleading stage, 'we need not accept as true unsupported conclusions and unwarranted inferences,'" *Id.* at 202 (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000)), we

---

supply of tickets on the resale market, leading to lower prices." *Finkelman*, 810 F.3d at 200. This was because League Insiders—who might have received their Super Bowl Tickets for free—could have been more inclined to resell their tickets than members of the general public were, since League Insiders could "pocket[] the entire resale price of the ticket as profit." *Id.*

17

concluded that Finkelman needed to present the court with additional facts in order to establish standing.[10]

Unlike the economic theories in *Finkelman*, the plaintiffs' theories in *Cottrell* were sufficient to establish Article III standing. In *Cottrell*, we held that plaintiffs, who purchased prescription eye-drops, had Article III standing to sue the manufacturers and distributors of those eye-drops. *Cottrell*, 874 F.3d at 169–70. The plaintiffs alleged that "manufacturers and distributors . . . packaged [the solution] in such a way that forced [plaintiffs] to waste

---

[10] After remand, Finkelman abandoned his first theory of economic harm and presented the district court with additional facts supporting his second theory. *Finkelman v. Nat'l Football League*, 877 F.3d 504, 512 (3d Cir. 2017). In particular, "Finkelman added facts alleged by . . . an economist who specializes in sports and ticketing on the workings of secondary ticket markets in events like the Super Bowl." *Id.* at 509. That economist explained, *inter alia*, "that under the NFL's current system, NFL insiders sell their tickets to a concentrated group of brokers, who in turn charge more for tickets on the secondary market. Without the NFL withholding, [the economist] posited that there would be more fan-to-fan direct sales of tickets, cutting out more brokers and allowing for lower prices." *Id.* Only after the presentation of these additional facts did we conclude that Finkelman had Article III standing. *Id.* at 513.

it." *Id.* at 159. Specifically, the plaintiffs claimed that the eye medication could only be dispensed from "unfairly" designed bottles that released drops larger than the human eye could hold at one time. *Id.* at 159, 161.

We concluded that the *Cottrell* plaintiffs had standing only *after* we conducted an analysis of their economic theories—as we did in *Finkelman*—and determined that the *Cottrell* plaintiffs' attempt to place an economic value on the "wasted" portion of the eye-drops was not conjectural. *Id*. at 168. Estrada attempts to read this important limitation out of *Cottrell*. She contends that *Cottrell* "confirmed that a consumer's purchase of a product based on the manufacturer's deceptive and unfair business practices constitutes injury-in-fact." Estrada Br. 2. In so arguing, Estrada overreads our opinion. The *Cottrell* plaintiffs did not have standing simply because they purchased a product that a consumer would view as flawed. Rather, the plaintiffs had standing only because they were unable to use a portion of the eye-drop medication they had purchased, and they alleged an economic theory that allowed them to value that unused portion.[11]

---

[11] Were we to accept Estrada's argument, one might reasonably wonder whether the *Cottrell* plaintiffs were foolish for suing only for the value of the portion of the eye-drops that they could not use, rather than suing for the value of the entire bottle. But unlike Estrada—who alleges

We did not offer lengthy analyses of the various economic theories presented in either *Finkelman* or *Cottrell* because we wished to sound pedantic. We conducted those analyses because Article III *requires* us to ensure that plaintiffs present more than merely conjectural assertions of injury. *Finkelman*, 810 F.3d at 193 (recognizing a "federal court's obligation to assure itself that it has subject matter jurisdiction").

Estrada nonetheless contends that, unlike the plaintiffs in *Finkelman* and *Cottrell*, she is not required to offer any economic theory of injury at the pleading stage. As her opening brief puts it, "[t]he amount Estrada and other members of the class may receive in damages or restitution is a different question than whether [she] has standing." Estrada Br. 26. Estrada further promises that, "[a]t the appropriate time after discovery," she will "put forth models for calculating damages and restitution that are linked to her theory of relief and are based on the evidence in the case." *Id*. Estrada's request to indefinitely defer what is a pleading obligation is not one we may grant and still fulfill our constitutional obligations.

To start, Estrada's promise to provide us with a means to conceptualize her injury at some *future* time does

---

an economic injury which includes portions of a product that she actually consumed—the *Cottrell* plaintiffs alleged an economic injury consisting of only the "wasted" portion of the product.

20

nothing to assist us in determining whether Estrada has standing at *this* stage. *Finkelman*, 810 F.3d at 202 ("Nor are we persuaded by plaintiffs' counsel's promises of future expert testimony when no facts supporting plaintiffs' theory of injury appear within the four corners of the complaint."). Our standing inquiry is restricted to the allegations currently before us.

In order to allege that she has suffered an economic injury as a result of simply purchasing Baby Powder, Estrada must allege that she purchased Baby Powder that was worth less than what she paid for. This is not to say that a plaintiff is required to allege the *exact* value of her economic injury at the pleading stage. Calculating and proving damages is indeed one of the major phases of a civil trial, and a plaintiff need not develop detailed economic models at the pleading stage to establish that she has standing.

But even at the pleading stage, a plaintiff must set forth sufficient factual allegations that, if proven true, would permit a factfinder to determine that she suffered at least *some* economic injury. *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (recognizing that establishing an injury in fact requires alleging an "identifiable trifle" of injury (quoting *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)). The *Cottrell* plaintiffs satisfied this relatively low hurdle by providing two theories which valued the "wasted" portion of the

21

medication that they had purchased. *Cottrell*, 874 F.3d at 168. One of the plaintiffs in *Finkelman* accomplished the same, after remand, by putting forth analysis by an economist who could explain how the NFL's ticketing policy allegedly resulted in increased resale prices. *Finkelman*, 877 F.3d at 509.

It would not have been enough for the plaintiffs in *Cottrell* and *Finkelman* to simply allege that, although they purchased eye-drops and football tickets at a given price, they later wished they had not done so. But that is as far as Estrada's allegations of economic injury go. Although "[i]njury-in-fact is not Mount Everest," *Danvers*, 432 F.3d at 294, it is more than a desert mirage. While the evidentiary burdens placed on a plaintiff at the pleading stage are minimal, our precedent requires the plaintiff to do more than simply pair a conclusory assertion of money lost with a request that a defendant pay up.[12]

---

[12] *See, e.g.*, *Twp. of Lyndhurst, N.J. v. Priceline.com Inc.*, 657 F.3d 148, 153, 155 (3d Cir. 2011) (concluding that a plaintiff-municipality's lost tax revenue, which could be calculated as the difference between taxes paid on "wholesale" rates and taxes paid on "retail" rates, constituted an economic injury sufficient to confer Article III standing); *Danvers*, 432 F.3d at 292 (referring to complaint language alleging that the Ford Motor Company's conduct required the plaintiffs-dealerships to make "very significant out-of-pocket investments to

Estrada fails to allege even that the Baby Powder provided her with an economic benefit worth one penny less than what she paid. We must, therefore, conclude that she received the benefit of her bargain and has suffered no economic injury.

But what are we to make of Estrada's allegations that she received only "unsafe" Baby Powder despite being promised "safe" Baby Powder? Estrada Br. 19–20.

comply with Ford's requirements," and further noting that "[p]laintiffs even break down the amount of money spent per dealership"); *see also Rivera v. Wyeth-Ayerst Labs*, 283 F.3d 315, 319 (5th Cir. 2002) ("Merely asking for money does not establish an injury in fact."); *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 504–05 (8th Cir. 2009) (noting that "[t]his case is similar to other no-injury cases," and concluding that "[t]he [plaintiffs' product] performs just as it was intended, and thus there is no injury and no basis for relief"). *But see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) ("Plaintiffs contend that class members paid more for [a braking system] than they otherwise would have paid, or bought it when they otherwise would not have done so, because Honda made deceptive claims and failed to disclose the system's limitations. To the extent that class members were relieved of their money by Honda's deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact.'" (citation omitted)).

23

Can we not presume that Estrada would spend more for safe powder than she would for unsafe powder? Should we further presume that this difference in price constitutes an economic injury sufficient to confer Article III standing? We cannot do so for at least two reasons—the first based in law, and the second based in fact.

First, such presumptions would turn the standing question on its head. It is well-settled law that "[w]e presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006); *Renne v. Geary*, 501 U.S. 312, 316 (1991) (same); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 (1986) (same); *King Bridge Co. v. Otoe Cnty.*, 120 U.S. 225, 226 (1887) (same); *Pennsylvania Family Inst., Inc. v. Black*, 489 F.3d 156, 164 (3d Cir. 2007) (same); *Philadelphia Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge*, 150 F.3d 319, 323 (3d Cir. 1998) (same); *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994) (same).

We cannot conclude that we have jurisdiction by presuming that Estrada would pay less for unsafe powder when she fails to even plead as much. And our refusal to leap to such a conclusion is supported by Estrada's apparent desire to continue purchasing Baby Powder in the future despite being aware of its alleged health risks.

24

Estrada Reply Br. 2, 18. It is worthy of note that Estrada's desire to continue purchasing Baby Powder is not conditioned on the powder being sold at a discounted price. In the absence of that condition, we would be hard-pressed to presume that Estrada wishes to continue to buy Baby Powder at anything other than its current market price, *i.e.*, the very price she has repeatedly paid for the product over the last six decades.

The second reason we cannot presume that Estrada suffered an economic injury by failing to receive "safe" powder is factual. Although Estrada contends that Baby Powder is "unsafe," her own allegations require us to conclude that the powder she received was, in fact, *safe as to her*. As we described early in this opinion, Estrada did not allege that she developed ovarian cancer, nor did she allege she is at risk of developing ovarian cancer in the future as a result of her Baby Powder use. Estrada's references to Baby Powder being unsafe *as to others* are not relevant to determining whether Estrada has standing *herself*. *Lujan*, 504 U.S. at 563 (1992) ("[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.") (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)).[13]

---

[13] The Dissent takes issue with our noting that Estrada received Baby Powder that was safe as to her. According to the Dissent, Estrada has standing because although *she*

25

We could not conclude that Estrada has standing even if she were to contend that, by "unsafe" powder, she meant not only powder that would cause her to develop ovarian cancer but also powder that would put her at *risk* of developing ovarian cancer. To be sure, had Estrada alleged that she was at risk of developing ovarian cancer, she may have established standing based on a theory of future physical injury. Because litigants and jurists cannot

received safe powder, *others* allegedly did not. As comparative examples, the Dissent refers to a parent who purchases organic food that turns out to not be organic, a consumer who purchases locksets marketed as being "Made in the U.S.A" that ultimately were not so made, and an observant Jew who purchases nonkosher meat that was improperly labeled as being kosher. But while the Dissent might be correct that those hypothetical plaintiffs would have standing, Estrada's case is unlike those examples. Instead, Estrada's claims are similar to those of a parent who indeed received organic food, a consumer who indeed received locksets domestically made, and an observant Jew who indeed received kosher meat—but who wish to sue because they claim that other individuals did not similarly receive the benefit of their own bargains. Although defendants who perform for some consumers but not others might be held liable pursuant to other mechanisms—by, for example, state attorneys general filing suit—Article III does not permit private plaintiffs to sue for injuries suffered only by others.

predict the future, the law will sometimes permit plaintiffs to establish standing based on injuries that are likely to occur later in time.

But Estrada chose not to allege any risk of developing ovarian cancer in the future. JA 49–50 ("Plaintiff is not claiming physical harm or seeking the recovery of personal injury damages."). Given the absence of such an allegation, Estrada cannot now claim that she was ever at risk of developing ovarian cancer.

To further illustrate this point, imagine that Defendants could go back in time to the 1950s when Estrada first purchased Baby Powder. Imagine further that, the moment before Estrada purchased that first bottle of Baby Powder, Defendants informed her that "although this powder might cause *others* to develop ovarian cancer, we have seen the future and we can tell you with absolute certainty that there is a zero percent chance that this Baby Powder will ever cause *you* to develop ovarian cancer." Can it be said that a plaintiff with a zero percent chance of ever experiencing a harm is at "risk" of experiencing that harm? The question answers itself. And because Estrada does not allege that she suffered harm through an increased risk of developing ovarian cancer, we can conclude that the powder Estrada purchased was not "unsafe."

In sum, although Estrada characterizes her Baby Powder purchases as economic injuries for which she is

entitled to relief, she has failed to allege that the economic benefit she received from that powder was *anything* less than the price she paid. In short, she received the benefit of her bargain.[14] Today, we therefore explicitly hold what

---

[14] To this end, we note that our holding does not conflict with the Supreme Court of California's holding in *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011), a case that Estrada favorably cites. In *Kwikset*, plaintiffs purchased locksets labeled "Made in the U.S.A.," and contended that they suffered an economic injury because those locksets contained foreign-made parts. *Kwikset*, 246 P.3d at 881. Interpreting a state standing provision purporting to reflect Article III's injury in fact requirement, the Supreme Court of California concluded that these plaintiffs had suffered an economic harm. *Id.* at 885. As the Court wrote, "[f]or each consumer who relies on the truth and accuracy of a label . . . the economic harm is the same: the consumer has purchased a product that he or she *paid more* for than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Id.* at 890.

The key language in that quote, as we read it, is the language that the Court chose to italicize: that a consumer has "*paid more*" for a product than she otherwise would have had it been properly labeled. *Id.* In analyzing whether the plaintiffs "*paid more*" for their locksets, the *Kwikset* Court noted that "[w]hether or not a party who actually received the benefit of his or her bargain may lack

28

might heretofore have been obvious: a plaintiff does not have Article III standing when she pleads economic injury from the purchase of a product, but fails to allege that the purchase provided her with an economic benefit worth less than the economic benefit for which she bargained.[15]

---

standing, in this case, under the allegations of the complaint, plaintiffs did not [receive the benefit of their bargain]." *Id.* at 892. Unlike the plaintiffs in *Kwikset*, who failed to receive the benefit of their bargains and thus "*paid more*" for their locksets, Estrada fails to allege the same.

[15] Although *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 258 (3d Cir. 2010) is an unpublished opinion and therefore not binding precedent, we find the rationale presented in that case to be both persuasive and consistent with our holding here. In *Koronthaly*, the panel considered whether a plaintiff had standing to sue a cosmetics manufacturer for failing to provide warnings about how much lead was in lipstick. *Koronthaly*, 374 F. App'x at 258. The plaintiff "did not know when she purchased the products that they contained any lead, and when she learned of the lead content she immediately stopped using them. Moreover, had she known of the lead she would not have purchased the products." *Id.* These facts are nearly identical to the operative facts in this appeal. In holding that the plaintiff did not have Article III standing in *Koronthaly*, the panel reasoned that "[a]bsent any

# IV. RESTITUTION

In addition to seeking monetary damages, Estrada seeks disgorgement of revenues and profit pursuant to the law of restitution.[16] An examination of Estrada's complaint reveals that her restitution claims are supported by only two conclusory assertions. First, Estrada alleges that Johnson & Johnson has "been able to sell the product for more than [it] otherwise would have had [it] properly informed consumers about the safety risks." JA 48.[17]

---

allegation that [the plaintiff] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [the plaintiff] has not demonstrated a concrete injury-in-fact." *Id.* at 259. That same rationale holds true in this case.

[16] JA 79 (seeking "restitution and disgorgement of Defendants' revenues" and further asking the District Court to direct "Defendants to identify, with court supervision, victims of their conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful").

[17] Estrada repeats this same point later in her complaint. JA 70 (stating that Johnson & Johnson was "able to charge more than [it] otherwise would have had [it] properly informed consumers that women who use Baby Powder in

Second, Estrada contends that Johnson & Johnson "reaped and continue[s] to reap enormous profits from [its] deceptive marketing." JA 70.

These two statements are nothing more than conclusory assertions and are therefore inadequate to provide Estrada with Article III standing. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) ("[W]hen it comes to injury, [Finkelman] looks only to the difference between a ticket's $800 face price and the price he paid and says, 'I have a strong suspicion that this ticket would have been cheaper if more tickets had been available for purchase by members of the general public.' That claim rests on no additional facts at all. It is pure conjecture about what the ticket resale market might have looked like if the NFL had sold its tickets differently. Article III injuries require a firmer foundation.").

As Part III explained, in order to seek monetary damages, Estrada must do more than simply characterize her purchases as economic injuries. The same rationale holds true as to her restitution claims—Estrada cannot invoke the federal judicial power simply by asserting that Johnson & Johnson has earned unlawful profits. Estrada's conclusory assertions are further weakened by her alleged desire to purchase Baby Powder in the future despite knowing of its alleged health risks. Estrada Reply Br. 2,

the genital area have a significant increased risk of ovarian cancer").

31

18. If Estrada herself wishes to purchase Baby Powder whether or not she knows of those health risks, why would the same not hold true for other consumers? And if other consumers were to purchase Baby Powder whether or not they were warned of the alleged health risks, how did Johnson & Johnson earn unlawful profits by failing to offer such warnings? Estrada's two conclusory assertions provide us not even a hint as to how we might answer these basic questions.[18]

In sum, Estrada's restitution claims are based on nothing more than mere conjecture. She pleads no facts

---

[18] And other questions come to mind. Estrada has observed that consumers are already highly informed of the alleged health risks associated with Baby Powder given the numerous publicly available studies and publications that she cites in her complaint. JA 54–67. Estrada's complaint refers to, *inter alia*, scientific studies from "as early as 1961," JA 54, a 1982 New York Times article regarding the alleged health risks of talcum powder, JA 67, and a pamphlet allegedly distributed "to all ovarian cancer patients at nearly every medical facility in the United States." JA 66. Wouldn't such widespread knowledge already have been factored into the current market price of Baby Powder? And if so, how did Johnson & Johnson earn unlawful profits by withholding information that the market might have already taken account of?

upon which a factfinder could conclude that Johnson & Johnson has been able to sell more Baby Powder than it could have had it informed consumers of the alleged health risks. We therefore conclude that Estrada lacks standing to seek relief in the form of restitution.

## V. INJUNCTIVE RELIEF

Finally, Estrada seeks injunctive relief in the form of "corrective advertising" and "enjoining Defendants from continuing the unlawful practices" of selling Baby Powder without properly warning consumers of the alleged health risks. JA 79.[19] In order to have standing to

---

[19] Estrada also refers in passing to "declaratory" relief three times in her complaint. JA 72, 79. All three references to "declaratory" relief are made in connection with her request for injunctive relief. JA 72 ("declaratory and/or injunctive relief"); *id.* (same); JA 79 ("declaratory and injunctive relief as permitted by law or equity"). Moreover, her third reference to "declaratory" relief appears to include both a reference to injunctive relief and relief based in restitution. JA 79 ("Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants . . . and directing Defendants to identify . . . victims of their conduct and pay them restitution and disgorgement."). Because Estrada's references to "declaratory" relief appear to be a mere rehashing of her requests for injunctive relief and

33

seek injunctive relief, Estrada must establish that she is "'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Because Estrada makes clear in this very lawsuit that she is well aware of health risks associated with using Baby Powder, we readily conclude that she is not likely to suffer future economic injury.

In *McNair*, we considered whether "former customers" of a magazine company had standing to seek injunctive relief. *Id.* at 215. The defendant-appellee in that case, a magazine marketing company by the name of Synapse Group Inc., had allegedly sold subscriptions in an unlawfully deceptive way.[20] Because the plaintiffs were former customers who were already aware of Synapse's advertising practices, we concluded that any future injury

---

restitution, we need not repeat our standing analyses as to those forms of relief.

[20] "The majority of Synapse's magazine subscriptions are offered under what is known as a 'continuous service plan' whereby a customer's subscription does not expire unless and until the customer opts to cancel it. To secure subscribers to those plans, Synapse offers introductory promotional offers under which customers can receive magazine subscriptions for free or at greatly reduced rates." *McNair*, 672 F.3d at 216.

they might suffer as a result of the company's advertising practices was "wholly conjectural." *Id.* at 225; *see also id.* at n.13 ("If Appellants' suggestion is that they may not be able to help themselves when confronted with a really good subscription offer, they have still not provided a basis for standing. Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court."). The premise that former customers could again be deceived by the very sort of advertising practices over which they were already pursuing equitable relief was a premise unmoored from reality.

Estrada has sued Johnson & Johnson for failing to warn her of certain health risks. To state the obvious, then, she is presently aware of those risks. As with the former customers in *McNair*, we wonder how Estrada could possibly be deceived again into buying Baby Powder without being aware of those same risks. She is simply not at risk of suffering an economic "injury," and we will not give cognizance to this sort of "stop me before I buy again" claim.

Perhaps sensing that *McNair* presents her with a real challenge, Estrada would have us limit *McNair* to instances when plaintiffs do not allege an intention to make purchases in the future. Estrada Reply Br. 17–18. Because Estrada desires to purchase Baby Powder in the

future, she contends that her case can be distinguished from *McNair*. *Id.* We decline to so limit *McNair*.

To begin with, we noted in *McNair* that "[p]erhaps [the former customers] may accept a Synapse offer in the future." *McNair*, 672 F.3d at 225. Given that recognition, it would require a strained reading of the case to conclude that the former customers' failure to allege a desire to subscribe in the future played a key role in our analysis. Our holding in *McNair* was instead more focused on the crucial fact that the former customers were already aware of the allegedly deceptive business practices from which they sought future protection. As we wrote in *McNair*, "the law accords people the dignity of assuming that they act rationally, in light of the information they possess." *Id.* That same rationale applies in the case at hand. The law affords Estrada the dignity of assuming that she acts rationally, and that she will not act in such a way that she will again suffer the same alleged "injury." We conclude that Estrada does not have standing to seek injunctive relief.

## CONCLUSION

Estrada contends that other people have suffered health complications from using Johnson & Johnson's Baby Powder. Regardless of whether that serious allegation has merit, injuries suffered by *others* do not permit us to conclude that Estrada has *herself* suffered an injury in fact. The only injury that Estrada alleges is purely

36

economic in nature—that is, that had she known more about Baby Powder, she would not have purchased it in the first place. But Estrada's wish to be reimbursed for a functional product that she has already consumed without incident does not itself constitute an economic injury within the meaning of Article III.

Estrada fails to provide a non-conjectural basis for concluding that she did not receive the benefit of her bargain. Estrada similarly fails to show that she is at risk of suffering an economic injury in the future, or that Johnson and Johnson has sold more Baby Powder than it otherwise could have. For these reasons, we conclude that Estrada does not have Article III standing to seek any of the three forms of relief requested in her complaint. The judgment of the District Court will be affirmed.

FUENTES, *Circuit Judge, dissenting*.

Juries across the country have returned verdicts finding, among other things, that Johnson & Johnson is liable to consumers of Johnson's Baby Powder for its propensity to increase the risk of ovarian cancer in women.[1] This case is not about that. Mona Estrada, a longtime consumer of Johnson's Baby Powder, makes no claim that she herself experienced a higher risk of ovarian cancer due to her use of the product. Instead, she alleges that Johnson & Johnson misrepresented what it sold her: a product, safe for daily use,that absorbs bodily moisture. She alleges that, had she known that the product was not safe, she would not have bought the product.

The majority is thorough and reaches a conclusion of law that, in the abstract, makes perfect sense: a plaintiff who receives the benefit of her bargain cannot assert that she has suffered an injury-in-fact to establish standing under Article III. I write separately because the majority omits key terms from the bargain struck between Estrada and Johnson & Johnson to reach the conclusion that Estrada received the benefit of her bargain. In my view, she did not. I would conclude from Estrada's pleadings that the safety of the product—as a general proposition, not specifically as to

---

[1] *See, e.g.*, Tiffany Hsu, *Johnson & Johnson Told to Pay $4.7 Billion in Baby Powder Lawsuit*, N.Y. TIMES, July 12, 2018, https://www.nytimes.com/2018/07/12/business/johnson-johnson-talcum-powder.html; Tina Bellon, *J&J hit with $21.7 million verdict in another talc asbestos cancer case*, REUTERS, May 23, 2018, https://www.reuters.com/article/us-johnson-johnson-cancer-lawsuit/jj-hit-with-21-7-million-verdict-in-another-talc-asbestos-cancer-case-idUSKCN1IO3HD.

1

Estrada herself—was an essential component of the benefit of Estrada's bargain.  Because Estrada alleges that the safety of the product was part of her bargain and that Johnson & Johnson misrepresented this key element, I would hold that Estrada has alleged injury-in-fact and standing under Article III.  At this stage of the proceedings, all Estrada must allege is an "identifiable trifle" sufficient to establish injury-in-fact for standing under Article III.[2]  She has done that.  Thus, I would vacate the order of the District Court and remand this case for further proceedings.

I.

According to Estrada's pleadings, Johnson & Johnson has encouraged women to dust themselves daily with Johnson's Baby Powder through labeling and advertising. Estrada alleges that while the specific language of the label has changed over time, its message has remained consistent: "that the product is safe for use on women as well as babies."[3] Historically, the label and advertising has encouraged women to dust themselves with Johnson's Baby Powder daily to mask odors.  Under a heading instructing customers when to use Johnson's Baby Powder specifically, the product says: "Use anytime you want skin to feel soft, fresh and comfortable.  For baby, use after every bath and diaper change."[4]

---

[2] *Bowman v. Wilson*, 672 F.3d 1145, 1151 (3d Cir. 1982) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686–90 & 689 n.14 (1973)).

[3] AA050.

[4] AA053.

Johnson & Johnson "seek[s] to convey an image as a safe and trusted family brand."[5] It operates a website specifically pronouncing "Our Safety & Care Commitment," in which it proclaims that "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care product from the Johnson & Johnson Family of Consumer Companies is safe and effective when used as directed."[6] On its website advertising Johnson's Baby Powder, Johnson & Johnson states that the product is "[c]linically proven to be safe, gentle and mild."[7] None of the product's labeling or advertising advises of an increased risk of ovarian cancer associated with use of Johnson's Baby Powder.[8]

The majority does not dispute that Estrada alleges that Johnson & Johnson held the product out as safe. I agree. The majority states that "Estrada's references to Baby Powder being unsafe *as to others* are not relevant to determining whether Estrada has standing *herself*."[9]

I depart from the majority's reasoning that Johnson's Baby Powder must be unsafe "as to [Estrada]" in order for safety to be part of the benefit of Estrada's bargain.[10] In support of this proposition, it cites *Lujan v. Defenders of Wildlife*, which holds that "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the

---

[5] *Id.*

[6] *Id.* (alteration in original).

[7] *Id.*

[8] *Id.*

[9] Majority Op. at 26 (emphasis in original).

[10] *Id.* (emphasis omitted).

3

party seeking review be himself among the injured." [11]  The majority's application of *Lujan* to exclude "safety as to others" from Estrada's bargain misapplies *Lujan* and misapprehends the nature of Estrada's injury.  Estrada's pleading makes it clear that Estrada does not allege that she is among those who have contracted or who have been exposed to an increased risk of contracting ovarian cancer due to her use of Johnson's Baby Powder.  Estrada alleges that her injury was the economic harm caused by purchasing a product due to Johnson & Johnson's misrepresentations that the product was safe.  She is, undisputedly, among the injured within the meaning of *Lujan* when it comes to the actual basis of her alleged injury-in-fact. I believe the Ninth Circuit succinctly stated the requirements of Article III as applied to economic harm when it wrote: "[W]hen, as here, 'Plaintiffs contend that class members paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so,' they have suffered an Article III injury in fact." [12]

## II.

The majority contends that Estrada received the benefit of her bargain because it was safe "as to her." [13]  This improperly confuses the benefit of the bargain relating to Estrada's alleged economic harm with the non-economic

---

[11] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992).

[12] *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012)) (alteration in original).

[13] Majority Op. at 26 (emphasis omitted).

4

harm—the actual danger allegedly posed by Johnson's Baby Powder—which is not at issue in this case.

What makes a product safe? If I buy a car of a make and model that reportedly explodes when driven, it seems obvious that the car is not safe. But what if I know that the specific car that I have purchased, and any subsequent cars of that make and model that I purchase, will never explode while I am in the car? The car or cars that I purchase contain the same structural defect that makes those cars explode but I, through the powers granted to me by legal fiction, know they will never explode while I am in the car. Under the majority's reasoning, this means that the car is safe as to me and, therefore, I have conceded that it is safe in any legal action I take against the manufacturer for selling a car with an evident inclination to explode. After all, I am totally protected from the risk posed by the defect. But no one would describe the car as safe.

When we talk about a product being "safe," and when manufacturers and vendors hold a product out as "safe," we are talking about two related but distinct concepts. The first is exactly what the majority describes: safety as to the immediate purchaser. This is a common conception of safety, the consumer who considers the product and asks: "Is this going to hurt and/or kill me?" This form of safety undergirds the claims that Johnson & Johnson misrepresented the safety of its product brought by plaintiffs who allege that they contracted or were exposed to an increased risk of contracting ovarian cancer. It is not at issue here.

But this is not the only form of safety. The second form of safety—the safety that was part of Estrada's bargain—

5

concerns the safety of a product generally, or its safety as to others. The parent who buys a toy for a child considers the safety of the toy not necessarily as to him or her but as to the child. A man might buy Johnson's Baby Powder that will be used by a woman with whom he cohabitates, and might very well consider the safety of that product as to the other person, not to himself.[14] In other words, understanding this form of safety relies in part on recognizing that the purchaser of a product may not be the consumer of a product. The connection need not be that direct, however. A product is advertised as safe for the same reason it is advertised as effective: to induce people to purchase it. A person may rely on various representations made by a manufacturer or vendor when determining whether to make a purchase.

*Kwikset Corp. v. Superior Court*,[15] a case decided by the Supreme Court of California, adjudicates standing in light of the very statute under which Estrada brings her claims. It is

---

[14] The majority conflates safety as a representation with safety as insulation from risk to Estrada specifically, which perhaps is why it notes skeptically that men could join Estrada's proposed class. I leave aside that class certification is well beyond the scope of subject-matter jurisdiction. I also leave aside that the putative class action elements of this case are entirely separate from whether Estrada herself has standing to pursue her claim. Here, however, the majority again seems to forget that Estrada does not allege that she was exposed to the danger allegedly posed by Johnson's Baby Powder. She alleges that Johnson & Johnson's representations of safety were among the terms under which she purchased the product. This valuation of safety is not gender-exclusive.

[15] 246 P.3d 877 (Cal. 2011).

worth noting, though hardly dispositive, that the standing requirements of this law are "substantially narrower than federal standing under article III, section 2 of the United States Constitution."[16] The majority dismisses Estrada's citation of this case because it concerns plaintiffs who did not receive the benefit of their bargain (where, purportedly, Estrada has),[17] but *Kwikset* is relevant because it illustrates why Estrada did not receive the benefit of her bargain. In *Kwikset*, plaintiffs purchased locksets labeled "Made in U.S.A." that contained parts manufactured abroad. The defendant made an argument that is identical to the majority's reasoning here: "[C]onsumers who receive a fully functioning product have received the benefit of their bargain, even if the product label contains misrepresentations that may have been relied upon by a particular class of consumers."[18]

Perhaps illustrating the fundamental simplicity of the case before us, the *Kwikset* court disagreed, stating:

> Plaintiffs selected Kwikset's locksets to purchase in part because they were "Made in U.S.A."; they would not have purchased them otherwise; and, it may be inferred, they value what they actually received less than either the money they parted with or working locksets that actually were made in the United States. They bargained for locksets that

---

[16] *Id.* at 886.
[17] Majority Op. at 28 n.14.
[18] *Kwikset*, 246 P.3d at 892.

were made in the United States; they got ones that were not.[19]

The *Kwikset* court further reasons:

> The observant Jew who purchases food represented to be, but not in fact, kosher; the Muslim who purchases food represented to be, but not in fact, halal; the parent who purchases food for his or her child represented to be, but not in fact, organic, has in each instance not received the benefit of his or her bargain.[20]

Estrada has alleged that there was a misrepresentation made by Johnson & Johnson as to the safety of Johnson's Baby Powder and, moreover, that the misrepresentation was material to her decision to purchase Johnson's Baby Powder.

At least this stage of the proceedings, where we only endeavor to determine whether a plaintiff has standing to pursue her claim, I see no reason we should devote ourselves to understanding *why* a plaintiff values what she values. As *Kwikset* notes:

> This economic harm—the loss of real dollars from a consumer's pocket—is the same whether or not a court might objectively view the products as functionally equivalent. A counterfeit Rolex

---

[19] *Id.*

[20] *Id.*

8

might be proven to tell the time as accurately as a genuine Rolex and in other ways be functionally equivalent, but we do not doubt the consumer (as well as the company that was deprived of a sale) has been economically harmed by the substitution in a manner sufficient to create standing to sue. Two wines might to almost any palate taste indistinguishable—but to serious oenophiles, the difference between one year and the next, between grapes from one valley and another nearby, might be sufficient to carry with it real economic differences in how much they would pay. Nonkosher meat might taste and in every respect be nutritionally identical to kosher meat, but to an observant Jew who keeps kosher, the former would be worthless.[21]

I am persuaded by this rationale. The parent who purchases "organic" food that is not organic need not justify her decision to purchase food labeled "organic." The *Kwikset* plaintiffs were not obliged to explain why they cared if the locksets they purchased were manufactured in the United States. It was sufficient that the misrepresentation of the manufacturer deprived them of the benefit of their bargain such

---

[21] *Id.* at 890.

9

that they would not have purchased the product had the product been labeled accurately. As courts construing *Kwikset* have stated: "[A] consumer's subjective willingness to pay more for the product than he or she would have been willing to pay in the absence of the misrepresentation is itself a form of economic injury 'whether or not a court might objectively view the products as functionally equivalent.'"[22] That is the same scenario presented before us today.

Estrada effectively alleges that she values "safety" as a label, akin to "organic" or "Made in U.S.A." When contrasted with the real danger allegedly posed by Johnson's Baby Powder, this misrepresentation might seem petty. However, that does not make it immaterial to Estrada's bargain as she alleges it.

### III.

The majority invokes two of our recent precedents to characterize Estrada's alleged injury as some attenuated, unknowable entity. The majority's invocation of *Finkelman v. National Football League* is misplaced.[23] Finkelman lacked standing because the basis of his alleged injury—the purportedly inflated price of Super Bowl tickets—was only speculatively affected by the NFL's conduct.[24] Finkelman bought his tickets at the inflated price, but did not at that point allege a set of facts under which the NFL's conduct caused the

---

[22] *Hansen v. Newegg.com Americas, Inc.*, 236 Cal. Rep. 3d 61, 72 (Cal. Ct. App. 2018) (quoting *Kwikset*, 246 P.3d at 890).
[23] *See* Majority Op. at 14–18.
[24] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 200 (3d Cir. 2016) (hereafter "*Finkelman I*").

10

price inflation.[25]  Finkelman did not allege that he would not have bought the tickets at the inflated price or, more applicably, that he would not have bought the tickets had he known that the NFL withheld tickets in such a way that the price was inflated.  Instead, Finkelman needed to establish with some particularity the chain of events that led to his economic injury because the injury itself—what money was actually lost— could not be established without that chain.  The majority misapplies *Cottrell v. Alcon Laboratories* similarly, and to the same effect.  In *Cottrell*, the plaintiffs did not dispute that they received the benefit of their bargain as to the portion of medicine that they were able to use from the dispensers at issue.[26]

The majority correctly notes that we did not analyze the economic theories presented in *Finkelman* and *Cottrell* "because we wished to sound pedantic."[27]  We are obliged by Article III to ensure that plaintiffs allege injury in *fact*, not conjecture.  In *Finkelman*, we needed to ascertain that a plaintiff who received the benefit of his bargain—tickets to the Super Bowl—was in fact injured by being compelled to pay more for his tickets because of the improper conduct of the seller.  We needed to determine whether the pleadings

---

[25] *See id.*; *cf. Finkelman v. Nat'l Football League*, 877 F.3d 504, 512 (3d Cir. 2017) (holding that Finkelman's amended complaint, which alleged "a casual chain justifying *why* the NFL's withholding set into motion a series of events that ultimately raised prices on the secondary market," alleged Article III standing) (hereafter "*Finkelman II*").

[26] *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 169–70 (3d Cir. 2017).

[27] Majority Op. at 20.

established that said compulsion occurred. In *Cottrell*, we needed to ascertain an injury (and the measurability of that injury) where the plaintiffs undoubtedly received the benefit of their bargain as to some portion of the medicine that they consumed. More complex theories of injury may be necessary where a plaintiff gets the benefit of his or her bargain in some of the product, or where the injury might be obscured by layers of market forces.

That is not the case here. Estrada alleges that she paid for a product based, in part, on Johnson & Johnson's representation of its safety. That representation was part of the benefit of her bargain. Because that representation was false, Estrada did *not* receive the benefit of her bargain.

Unlike *Finkelman*, Estrada need not allege a chain of events to show that she paid a price she would not have otherwise paid for Johnson's Baby Powder. In my view, it suffices that she alleges that she would not have purchased the product. The price increase in her bargain with Johnson & Johnson caused by the company's alleged misrepresentation as to safety is the total sum she paid for the product.

Unlike the *Cottrell* plaintiffs, Estrada does not concede that she received the benefit of her bargain as to *some* of her purchase—that some of the product was safe as represented by Johnson & Johnson.[28] Estrada alleges that the whole product fails to satisfy the representation of safety made by Johnson & Johnson. If Johnson & Johnson or Estrada can, by expert

---

[28] Additionally, for this reason, the majority's assertion that Estrada's theory of standing would have entitled the *Cottrell* plaintiffs to sue for the contents of the entire bottle is wrong.

12

testimony, demonstrate that only a certain portion of Johnson's Baby Powder is unsafe, that is certainly a question of damages, not of injury-in-fact.

Moreover, the majority's logic is incompatible with *Cottrell*. After all, the *Cottrell* plaintiffs used all the medicine. Their bargain could be circumscribed just as the majority edits the terms of Estrada's bargain: the *Cottrell* plaintiffs bargained for the benefits of the medicine, not medicine delivered in a minimum effective dose so as to maximize the medicine's utility. But we wisely recognized in *Cottrell* that the benefit of the bargain encompasses the whole bargain, and that the bargain should not be redefined to neatly encompass only what plaintiffs actually received, instead of what they were promised.

IV.

The majority further holds that Estrada has failed to plead facts sufficient to establish standing to pursue restitution and to pursue injunctive relief. I disagree, largely for reasons already articulated.

With respect to restitution, the majority concludes that Estrada only makes conclusory allegations that Johnson & Johnson sold Johnson's Baby Powder for more money than it would have made had it disclosed the alleged risk of ovarian cancer. In this case, I would rely on the precedent of this Court that "federal courts typically credit allegations of injury that involve no more than application of basic economic logic."[29]

---

[29] *Finkelman*, 810 F.3d at 201 (internal quotation marks and citation omitted).

13

Dealing only with the allegations of the pleadings, it seems sufficiently elementary that a product held out as safe will command a higher price than a product held out as markedly increasing a woman's risk of developing ovarian cancer. As such, I believe Estrada has alleged that Johnson & Johnson profited from its allegedly unlawful misrepresentation.

With respect to injunctive relief, I do not read Estrada's allegation as in fundamental tension with *McNair v. Synapse Group Inc.*[30] I read Estrada's allegations about desiring to purchase the product as inextricable from the bargain she struck with Johnson & Johnson. While the majority reads her pleadings to state that Estrada is willing to purchase the product as-is, given her allegations it makes more sense to understand that Estrada's pleaded desire to purchase baby powder in the future is contingent on Johnson & Johnson offering a product that meets the terms of her bargain. She is only unlikely to suffer future economic injury if we presume that Johnson & Johnson has lied and will continue to lie in its labeling, or that Estrada will assume that any label offered by Johnson & Johnson is untruthful.

Moreover, I believe plaintiffs alleging harm caused by defendants' misrepresentations are entitled to seek injunctive relief against those misrepresentations, in part because that is explicitly permitted under California's Unfair Competition Law under which Estrada sues.[31] A plaintiff who is sufficiently aware of misrepresentations and who alleges injury-in-fact under a theory of economic harm, or any theory of harm, is unlikely to continue purchasing that product as

---

[30] 672 F.3d 213 (3d Cir. 2012).

[31] *See* Cal. Bus. & Prof. Code § 17204.

14

offered beforehand.  If our reasoning compels us to interpret Article III to effectively strike down a provision of state law, and the law of a state not within this Circuit, I believe we have erred.

V.

Article III standing is the minimum hurdle that a plaintiff must meet to bring her claim in federal court.  To conclude here that Estrada has pleaded standing, we need not and, in fact, cannot determine whether she has stated a claim sufficiently to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  We cannot address whether this claim as pleaded establishes a sufficient basis for class certification under Federal Rule of Civil Procedure 23.  As previously stated, our only duty here is to determine whether Estrada alleged an "identifiable trifle" sufficient to establish injury-in-fact for standing under Article III.[32]  Because Mona Estrada has met that bare minimum requirement, I respectfully dissent.  I would vacate the District Court's order and remand for further proceedings.

---

[32] *Bowman*, 672 F.3d at 1151 (citation omitted).